IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:08-CR-42 |
| | ) | |
| BRETT EDWARD DIRR, and | ) | (PHILLIPS/SHIRLEY) |
| RENEE DIRR, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to

28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the

District Court as may be appropriate. This case is before the Court on the defendants' Joint

Motion to Suppress and Motion to Compel Return of Defendants' Documents [Doc. 55], filed on

August 29, 2008. The defendants seek [Docs. 55, 74, 99, and 100] the suppression of all

evidence seized in the August 10, 2005 search of their home in Walland, Tennessee (search

pursuant to the "Tennessee search warrant") and the August 16, 2005 search of Mr. Dirr's hotel

room in Charleston, South Carolina (search pursuant to the "South Carolina search warrant"),

contending that the search warrants are facially invalid and that the execution of both search

warrants violated the Fourth Amendment. They also seek to compel the return of all the

documents seized pursuant to these warrants. The government maintains [Docs. 65 and 98] that

the retained evidence was properly seized pursuant to valid warrants or to the plain view

doctrine.

1

# I. PROCEDURAL HISTORY

The parties appeared before the Court on October 29 and 30, 2008, for hearings on pending motions. Assistant United States Attorneys Charles E. Atchley, Jr, and Frank M. Dale, Jr., appeared on behalf of the government. Attorney Alan S. Richey represented Mr. Dirr, who was also present. Mrs. Dirr represented herself. Following argument on the defendants' motion to suppress [Doc. 55], the parties agreed to meet on November 6, 2008 for the return of documents seized from the defendants' home that were not relevant to the case. The Court held the suppression motion in abeyance, pending the parties' resolution of all or part of the issues.

On November 25, 2008, the Court received a copy of a November 22, 2008 letter from Mrs. Dirr that she had written to AUSA Dale, describing perceived problems with the return of documents. The Court ordered [Doc. 80] that the parties appear on December 22, 2008, for a status conference and supplemental motion hearing on the suppression motion and on the treatment of that motion and Mrs. Dirr's November 22, 2008 letter as a motion for relief under Rule 41(g) of the Federal Rules of Criminal Procedure. Prior to the hearing, the government filed a response [Doc. 82] to Mrs. Dirr's letter, relating that documents that the government did not need for the trial of this matter would be available for the defendants to pick up by December 15, 2008.

On December 22, the parties appeared for the status conference and supplemental motion hearing. AUSA Atchley and AUSA Dale represented the government. Attorney Richey represented Mr. Dirr and appeared by telephone. Both Mr. and Mrs. Dirr, who again represented herself, were present. The government returned three boxes of items seized in the August 10, 2005 search of the Dirrs' house and the August 16, 2005 search of Mr. Dirr's hotel room. Mrs.

Dirr objected to the government's failure to return the items in seven or eight other boxes, arguing that they were not within the scope of the warrants. After listening to the parties' positions on a number of folders and books, the Court determined that the issues could not be resolved without a full evidentiary hearing. The Court ordered [Doc. 87] the parties to submit supplemental filings in which the government was to list the documents that remained in dispute and relate whether those documents were seized pursuant to the search warrants or the plain view doctrine. The government filed its Notice of Compliance with Order Regarding Seized Items [Doc. 92] on January 12, 2009. The defendants filed responses [Docs. 94 and 95] to this notice on January 20 and 21, 2009.

On January 22, 2009, the Court held an evidentiary hearing on the suppression motion and the related issues surrounding the return of documents. AUSA Atchley and AUSA Dale represented the government. Attorney Richey appeared with Mr. Dirr, and Mrs. Dirr appeared *pro se*. The government presented the testimony of Internal Revenue Service Agent Brian Groves. Following the parties' arguments, the Court requested supplemental briefs on the validity of the South Carolina search warrant, issues relating to the particularity requirement, and issues relating to the seizure of items pursuant to the plain view doctrine. The government [Doc. 98], Mr. Dirr [Doc. 99], and Mrs. Dirr [Doc. 100] filed their supplemental briefs on February 13, 2009. On March 19, the parties appeared for a hearing on the defendants' motion to continue the trial. At that time, the Court permitted the parties to file reply briefs to the supplemental briefs. The government [Doc. 108], Mr. Dirr [Doc. 109], and Mrs. Dirr [Doc. 110] filed supplemental reply briefs on April 6. 2009. On April 8, 2009, Mr. Dirr filed a Notice of Joinder of Renee Dirr's Opposition to U.S.'s Position [Doc. 111]. The following day, Mrs. Dirr filed a Notice of

Joinder to Defendants' Response to U.S.'s Supplemental Brief After the Suppression Hearing [Doc. 112]. The Court took the motion and all of the briefs, testimony, and arguments relative to the suppression motion [Doc. 55] under advisement on April 10, 2009.[1]

Since that time, the parties have continued to file motions and responses nearly every week to ten days, including the following: Motion to Dismiss for Lack of Venue [Doc. 113], filed by Mrs. Dirr on April 28, 2009; Notice of Joinder of Renee Dirr's Motion to Dismiss for Lack of Venue [Doc. 114], filed by Mr. Dirr on May 1, 2009; United States' Motion to Strike as Untimely Renee Dirr's Motion to Dismiss for Lack of Venue [Doc. 115], filed on May 15, 2009; Response in Opposition to United States' Motion to Strike [Doc. 116], filed by Mrs. Dirr on May 22, 2009; Motion to Compel Response to Motions [Doc. 118], filed by Mrs. Dirr on July 8, 2009; Motion for Recusal of Judge Phillips [Doc. 120], filed by Mrs. Dirr on July 17, 2009; Notice of Joinder of Motion to Compel Response to Motions [Doc. 119], filed by Mr. Dirr on

---

[1]The Court notes that the time necessary for the preparation of this Report and Recommendation has extended beyond thirty days from the time that it was taken under advisement on April 10, 2009. See 18 U.S.C. § 3161(h)(1)(H) (excluding from the speedy trial calculation up to thirty days during which a matter is under advisement by the court). The Court finds that the intervening time was necessary for a complete and accurate consideration of the numerous issues raised with regard to the defendants' suppression motion. The sheer number of documents at issue, which were seized pursuant to two different search warrants, along with the number of objections and variety of arguments raised with regard to the searches, search warrants, and items seized have made it impossible to complete the report within the time frame envisioned in the common case. In this regard, the Court has found [Doc. 130] that this case is complex for speedy trial purposes because "the history of this case, including the defendants' sustained effort to raise factual and legal questions–some of which can certainly be characterized as novel–well beyond the motion-filing deadline, makes it unreasonable to expect the completion of pretrial proceedings . . . within the time perimeters given in a typical case." 18 U.S.C. § 3161(h)(7)(B)(ii). Accordingly, the Court finds that the time that it has taken to prepare this Report and Recommendation was necessary and proper. Finally, the Court notes that all of the time during which the suppression issues have been under advisement has been excluded pursuant to an ends of justice continuance. [Docs. 105 and 130].

July 20, 2009; Notice of Joinder of Motion for Recusal [Doc. 121], filed by Mr. Dirr on July 21, 2009; United States Opposition to Motion for Recusal [Doc. 124] filed on July 31, 2009; Mr. Dirr's Reply for Recusal [Doc. 128], filed on August 6, 2009; and Mrs. Dirr's Notice of Joinder of Defendants' Reply for Recusal [Doc. 129], filed on August 7, 2009. Nonetheless, this Report and Recommendation will address and limit itself to the Joint Motion to Suppress and Motion to Compel Return of Documents [Doc. 55] and the ancillary and supplemental filings to that motion.

## II. POSITIONS OF THE PARTIES

Both defendants are charged [Doc. 5] with conspiracy to defraud the government by obstructing the collection of taxes from 2000 to 2008. Mr. Dirr is also charged with five counts of tax evasion from 2001 to 2005 and five counts of failure to make an income tax return also from 2001 to 2005. The Dirrs contend [Doc. 55] that their rights under the Fourth Amendment were violated by the improper execution of the Tennessee and South Carolina search warrants. They argue that the officers and agents unreasonably disregarded the scope of the warrants and conducted what amounted to a general search. They maintain that the officers could not properly rely upon the plain view doctrine to seize items that did not come within the scope of the warrants because the items were not immediately incriminating. The Dirrs argue that the vast number of items seized outside of the scope of the warrants converts the search warrants into general warrants, requiring suppression of all evidence seized under the warrants.

With regard to the Tennessee search warrant, the defendants argue that it is overly broad because it does not list a time frame in which the warrant must be executed. They also

specifically challenge the execution of the Tennessee warrant by arguing that the executing law enforcement officers did not present the warrant upon initiating the search and that the affidavit supporting the warrant was not produced at the time of the search and was not filed until August 23, 2005.  They maintain that some of the officers executing the warrant were not authorized officers of the United States, as stated in the search warrant.  Finally, they contend that the executing officer improperly prepared the inventory at the conclusion of the search.

Although seemingly unrelated to their issues with the search warrants, the defendants also raise in passing in their briefs a Fifth Amendment issue with respect to events preceding the execution of the South Carolina search warant:  The defendants contend that on August 11, 2005, Mr. Dirr was interrogated by law enforcement officers for nearly two hours without being advised of his <u>Miranda</u> rights.  They maintain that officers gained access to his hotel room by threatening to harass him at work the next day if he did not talk with them.  In their supporting memorandum, they imply that this meeting was not a consensual encounter.

The defendants did not initially contest the validity of the South Carolina search warrant, apart from its execution, but at the January 22 hearing and in their supplemental briefs, the defendants contend that the South Carolina search warrant is facially invalid.  They argue that the South Carolina search warrant does not contain a statement of probable cause for the search, a reference to the alleged criminal activity, a time frame for execution, the name of the judicial officer to whom the return is to be made, or a case number.  Additionally, they argue that the terms "anti-government rhetoric" contained in the attachment listing the items to be seized is too subjective and, thus, overly broad.

Finally, the defendants contend that the government must return all items seized

6

pursuant to the search warrants to them so that they can prepare their defense. They assert that it is unfair for the government to control their access to these documents. Although not couched as such, per se, the Court takes this to be a motion for the return of property pursuant to Rule 41(g), Federal Rules of Criminal Procedure.

The government contends [Doc. 65] that both search warrants were properly executed and that Mr. Dirr was not in custody when he spoke with IRS agents in his hotel room on August 11, 2005. It argues that the descriptions of items to be seized in the warrants were sufficiently particular for the type of investigation that the IRS was conducting. It states that the majority of the documents taken from the Dirrs' home and Mr. Dirr's hotel room are either personal financial records or personal business records permitted by the warrants. Other items were properly seized pursuant to the plain view doctrine. Moreover, the government maintains that if the Court finds that portions of the warrants are overly broad, the appropriate remedy would be to sever those portions, not to suppress all evidence seized in relation to both warrants.

With regard to the Tennessee search warrant, it asserts that Mrs. Dirr was provided a copy of the search warrant after the officers conducted a security sweep of the area for officer safety. The government acknowledges that the affidavit did not accompany the search warrant but maintains that the affidavit is not normally provided to the property owner at the time of the search. Finally, it states that uniformed local law enforcement officers were present to provide a law enforcement presence and provide security for the search.

The government argues that the August 11, 2005 meeting between IRS agents and Mr. Dirr in Mr. Dirr's hotel room was a consensual meeting in which the IRS sought Mr. Dirr's cooperation in their investigation. It asserts that Mr. Dirr allowed the agents to enter his hotel

room, was not in custody, and could have ended the conversation at any time. It maintains that the one-hour-twenty-five-minute conversation was not an interrogation and that the agents met with Mr. Dirr again the next morning at a McDonalds restaurant at Mr. Dirr's request.

The government argues that the South Carolina search warrant is facially valid. It maintains that the defendants' alleged defects relate to matters that are either not required by Rule 41, Federal Rule of Criminal Procedure, or are ministerial in nature and do not require suppression of the evidence. The government asserts that if the Court does find the South Carolina search warrant to be deficient, the good faith exception applies in this case to prevent the suppression of evidence.

Finally, the government contends that it has consistently permitted the defendants access to the evidence seized from their house and that it has offered to have copies made of all non-copyrighted materials. Accordingly, it contests the return of the documents and materials prior to trial.

## III. SUMMARY OF TESTIMONY

At the October 29, 2009 hearing, the government proffered the following: Cassette tapes seized from the defendants' home were contained in a box labeled "Bill B's package." Upon opening the box, the agents realized that it contained the Reliance Defense package by Bill Benson. Benson advocates placing certain items in a box that the person will later use to help negate willfulness if they are ever prosecuted. The cassette tapes in the box were labeled "Bill Benson," "Mr. Benson," and with the names of two other persons who taught tax protestors. The agents immediately recognized the significance of the items contained in the

8

box.

The October 29, 2008 hearing was continued to the following morning. At that time, counsel for Mr. Dirr agreed that he did not contest the facts in the proffer.

At the January 22 hearing, the government presented the testimony of IRS Agent Brian Groves. Agent Groves testified that he has worked as a special agent of the IRS for seventeen years. He stated that he has investigated multiple tax cases, including anti-taxation cases. He has received training about various tax-avoidance schemes. From his continuing education courses, he knows that the abuse of trusts is a major issue in tax avoidance.

Agent Groves testified that he began investigating the Dirrs in the spring of 2005. He reviewed the documents that they had filed with the IRS. An audit of the Dirrs revealed indications of fraud. Agent Groves stated that he executed the Tennessee and South Carolina search warrants in this case. In conjunction with obtaining these search warrants, he presented affidavits to the courts, but these affidavits did not accompany the warrants when they were executed. Regarding the South Carolina search warrant, Agent Groves testified that he added the term "anti-government rhetoric" to the list of items to be seized in the South Carolina search warrant because he had found a large amount of research and materials on "tax scams" in the earlier search of the defendants' home in Tennessee. Groves said that by anti-government rhetoric, he actually meant anti-IRS rhetoric.

*1. Global Prosperity Binder (Tennessee search–plain view)[2]*

---

[2]In preparation for the January 22 hearing, the government created a list [Doc. 92, Exhibit C] of items seized in the two searches, the location from which each item was seized, and the basis for seizing the item (pursuant to the search warrant or plain view). The Court has included headings based upon Exhibit C within the summary of Agent Groves' testimony to facilitate the analysis of the items later in the report.

9

Agent Groves stated that from a bookshelf in the basement of the Dirr's home, he seized a binder entitled The Global Prosperity 2001 Foundational Education Course. The binder contained cassette tapes. According to Groves, Global Prosperity is a "well-known tax scam" involving concealing assets and income. He knew that the Dirrs had formed the Lotus Group to conceal assets. Upon seeing the Global Prosperity binder, it was immediately apparent to him that it was evidence of the crimes he was investigating, particularly of the element of willfulness, and he seized the binder under the plain view doctrine. He stated that most tax-resister defenses centered around the element of willfulness, which was the most difficult element to prove with respect to the crimes cited in the affidavits to the two search warrants.

On cross-examination, Agent Groves admitted that at the time he conducted the search of the Dirr's home, he had not previously listened to the Global Prosperity cassettes. Instead, he was aware that Global Prosperity was a "notorious tax scam" from a training course. Global Prosperity sold a package of twelve tapes with instruction on how to commit income tax evasion. Since seizing the binder, he has listened to the cassette tape labeled "Taxation." He testified that there was a clear nexus between the Dirrs' beliefs and tax evasion. Groves acknowledged that after the search of the Dirrs' home, he prepared the inventory of all items seized for the search warrant return and that he did not list plain view as the reason for taking any of the items seized in the search. He stated that the title Global Prosperity appeared on the exterior of the binder.

*2. Internal Revenue Code (Tennessee search–plain view)*

Agent Groves stated that he seized a copy of the Internal Revenue Code from the Dirr's basement bookshelf based upon the plain view doctrine. He said that the Code had been

10

tabbed and highlighted. He believed the Code showed the Dirrs' knowledge and understanding of the tax code. Based on his investigation, he knew the Dirrs had filed multiple documents with the IRS that misrepresented income and the term "person."

On cross-examination, Agent Groves stated that he decided to seize the Code as soon as he saw it, even though he did not see the tabs on it until he removed it from the bookshelf. He agreed that he did not know who placed the tabs on the Code or who highlighted portions of it. He stated that he did not consider the Code itself to be anti-government. He explained that he had characterized the Code as an anti-IRS publication in the return inventory based upon the location of the tabs in the Code.

*3. Unlabeled blue binder containing copies of tax-resister affidavits sent to public officials, correspondence with the IRS, transcripts from the IRS, IRS forms, tax-resister documents, and forms intended to eliminate employment tax withholding (Tennessee search–search warrant)*

Agent Groves testified that he seized a binder containing affidavits that the defendants had filed with the IRS proclaiming themselves freeborn citizens and stating that they had no tax liability. He said that these items were seized pursuant to the search warrant because they were personal financial records. On cross-examination, he agreed that the government already had copies of the documents that the Dirrs had filed with the IRS, but he stated that it was relevant that the Dirrs had retained a copy. He stated that he had expected to find these items on the Dirrs' computer because he noted in the affidavit that they were computer-generated. Instead, he ultimately found the files on a floppy disk. He said that these items fell within the category of computer-generated media and financial documents because he had assumed that they were computer-generated.

11

4. _Redemption in Law: Theory and Practice–"Cracking the Code"_ (Tennessee search–plain view)

Agent Groves testified that he was familiar with the use of false Uniform Commercial Code (UCC) filings by tax resisters and that Mr. Dirr had made false UCC filings. He said that when he saw the book, <u>Redemption in Law: Theory and Practice–"Cracking the Code"</u>, it was immediately apparent to him that it was evidence in this case. On cross-examination, he stated that he found this book on the bookshelf in the basement of the Dirr's home. He said that <u>"Cracking the Code"</u> referred to the Uniform Commercial Code. He believed that this book was possibly evidence of the defendants' willfulness.

5. _Unlabeled manilla folder containing printed tax-resister materials (Tennessee search–plain view)_

Agent Groves stated that he found a manilla folder containing two documents on the basement bookshelf. One document is entitled "Tax Answers the IRS Doesn't Want You to Have." Grove said that the author David Miner, is a known local tax protestor, whom Groves had investigated at the same time he investigated the Dirrs. The other document was "Illegal Authority of Income Tax." Groves stated that he was also aware of Robert Schulz, whom the government's list indicates is the author of this second article. Groves testified that as soon as he opened the folder, it was readily apparent to him that this was evidence in this case based upon his knowledge of David Miner. Groves said the We the People Foundation is a "notorious tax scam." On cross-examination, Groves stated that at the time of the search, he opened the folder, read the title, and read the author's name. He did not read the two documents until later.

6. _Liberty Redemption Pack_ and _Liberty Action Pack_ by Dana Ewell (Tennessee search–plain

*view)*

Agent Groves testified that on the bookshelf, he found two black binders comprising the <u>Liberty Redemption Pack</u> and <u>Liberty Action Pack</u>, which were tax-protestor guides by Dana Ewell. He stated that Ewell runs the Liberty Action "tax scam" and that the Dirrs had put the contents of these binders into practice. He stated that the binders contained "go-by's" for much of what the defendants had filed, including sham UCC filings.

On cross-examination, Groves said he first became aware of Ewell in the late 1990's or early 2000's. He acknowledged that the binders did not bear Ewell's name, but said that the publisher Sleeping Eagle Press, which is listed on the outside of the binders, was well-known for its association with Ewell. He said he opened these binders at the Dirr's home and saw the "go-by's" inside.

*7. Printout of IRS Internet Article entitled "IRS and States Announce Partnership to Target Abusive Tax Avoidance Transactions" (Tennessee search–plain view)*

Agent Groves stated that he found a printout of an article from the IRS's website in the Dirr's basement, although he did not recall exactly where. He said he seized the article under the plain view doctrine because it showed that the defendants had been researching abusive tax schemes and, thus, the article is evidence of their knowledge. On cross-examination, Groves testified that he was one of eight IRS agents participating in the search of the Dirr's home. He stated that when someone else found an item, he would go to them, and they would show it to him. He said he believed the article was found on the bookshelf, but he did not know exactly where it was found. He said he was not familiar with this article and that he did not read it at the Dirr's home. He said it was standard procedure to seize items and then review them

13

once he returned to the office.

*8. Excerpts from "Master File Decoder" (Tennessee search–plain view)*

Agent Groves stated that he found a printout of an internet article by Christopher M. Hanson explaining how to decode one's individual master file (IMF) and stating that the "z" code indicated a criminal investigation. He said that another "scam" of which he was aware involved deciphering the IMF in order to intimidate IRS officers into discontinuing an investigation. On cross-examination, he said he found this printout on the bookshelf. He stated that David Miner advocated using portions of one's master file in order to sue IRS agents to get them to reverse the codes. Groves believed that the Dirrs' possession of this printout showed their knowledge of how to read the IMF.

*9. Contents of box labeled "Bill B.'s Pkg."  (Tennessee search–plain view)*

Agent Groves testified that Special IRS Agent Lynn Barker found a box labeled "Bill B.'s Package" in the Dirr's basement crawl space and immediately got Groves. Groves said he was familiar with Bill Benson, who wrote <u>The Law That Never Was</u>. He said that the purpose of the Reliance Defense Package was to present its contents to the IRS when under investigation for tax evasion in order to negate one's willfulness and knowledge. He believed that the contents of the box directly related to the crimes under investigation in this case.

On cross-examination, Groves admitted that the box contained items other than those sold by Benson, such as correspondence between Benson and the Dirrs and a receipt of purchase. He said he seized the box as it was and did not look through it at the Dirrs' residence. He said before the search, he knew that Benson sold the Reliance Defense Package. He seized the box under the plain view doctrine.

14

Agent Groves testified that he did not personally prepare the inventory list from the search of the Dirrs' home. He did present the list to Judge Phillips. Although he reviewed the list, he did not compare it to the items seized.

*10. Folder labeled "Strawmen/Women Birth Certificates" (Tennessee search–search warrant and plain view)*

Agent Groves stated that he seized a folder labeled "Strawmen/Women Birth Certificates." He said that the Dirrs had filed these as fraudulent UCC financial statements in order to inhibit the collection of taxes. The UCC portions of the folder were seized as financial records under the search warrant. The remainder of the folder, including handwritten notes about Bill Benson and regarding an organization called HTS, were seized under the plain view doctrine. On cross-examination, Groves testified that the folder was found in the basement. He stated that the folder contained a fax cover sheet to the state regarding filing the birth certificates under the UCC.

*11. Folder labeled "Quit Denzo Prep" (Tennessee search–search warrant)*

Agent Groves testified that he seized a folder labeled "Quit Denzo Prep," which contained personal financial documents relating to Mr. Dirr quitting his job at Denzo. On cross-examination, he acknowledged that he seized the entire folder due to the financial records contained in it. He said that except for a couple of pages, all of the items in the folder were financial records.

*12. Folder labeled "Navus Automation" (Tennessee search–search warrant)*

Agent Groves stated that he seized a folder labeled "Navus Automation" pursuant to the search warrant because it contained Mr. Dirr's employment records, which are personal

15

financial records. On cross-examination, he said that he considered anything related to Mr.

Dirr's employment to be a personal financial document because such documents could be used

to contact the defendant's employers. He agreed that these documents were relevant to the

calculation of the taxes that the Dirrs' owed.

*13. Folder labeled "Dana-IRS Stuff" (Tennessee search–search warrant and plain view)*

Agent Groves testified that he found a folder in the area of the basement desk and

shelves that was labeled "Dana-IRS Stuff." The folder contained correspondence with Dana

Ewell, author of the <u>Liberty Redemption Pack</u>, relating to the Lotus Group. It also contained

documents relating to placing assets in trusts and hand-written notes regarding signing

documents with a full reservation of rights. Groves observed that the defendants had signed their

responses to various IRS letters in this way.

On cross-examination, Groves stated that he had to open the folder and read its

contents in order to find those documents and noted that he seized the folder pursuant to the

plain view doctrine. He believed the documents contained in the folder were relevant to the

defendants' mindset.

*14. Unlabeled blue binder containing correspondence from the IRS to the defendants (Tennessee*

*search–search warrant)*

Agent Groves said that he found a blue three-ring notebook containing

correspondence from the IRS regarding Mr. Dirr's Freedom of Information Act request to

eliminate or correct tax. On cross-examination, he agreed that these were documents that the

IRS sent to the defendants.

*15. Blue binder containing correspondence with IRS, with IRx Solutions regarding Mr. Dirr's*

16

*IRS files, and with David Miner (Tennessee search–search warrant)*

Agent Groves stated that he found another blue binder that contained Freedom of Information Act requests, which he seized pursuant to the warrant. It also contained a letter from David Miner and IRx Solutions regarding decoding the IMF and decoded documents. The letter refers to filing multiple Freedom of Information Act requests to learn the names of IRS employees. On cross-examination, Groves said that any correspondence with the IRS relates to finances and determining tax liability.

*16. IRS transaction codes pocket guide (Tennessee search–plain view)*

Agent Groves testified that he found an IRS code pocket guide in the area of the desk and shelves in the basement. He stated that this was a public document published by the IRS and that anyone could get one. He said that this item shows the Dirrs' knowledge and willfulness. On cross-examination, Groves said that this guide contains information on computing taxes and decoding the IMF, so it is evidence of the defendants' knowledge of taxes and the IRS.

*17. Business cards from the defendants' home businesses (Tennessee search–search warrant)*

Agent Groves stated that he seized business cards relating to the Dirrs' home businesses, Living in Paradise and Tahitian Noni Juice, because these items show that the Dirrs had taxable income.

*18. Check book (Tennessee search–search warrant)*

Agent Groves said that he found a check book, credit cards, and a currency wrapper on a sewing table. He did not recall if the credit cards were removed from a wallet when they were seized.

17

*19. Folder labeled "Social Security" (Tennessee search–search warrant)*

Agent Groves testified that he found a folder labeled "Social Security" and containing an invoice for the purchase of silver, a 1998 tax return, pay stubs, vehicle registration information in the name of the Lotus Group, and social security statements. He said these items were seized under the search warrant because they are personal financial records. On cross-examination, he said he found the folder in the kitchen-dining room area on the table. He assumed that the contents of the folder are as they were at the time they were seized because he would not place loose papers into a folder. He acknowledged that the search warrant authorized the seizure of personal financial records from 1999 through 2005, but he said that the 1998 return would have been filed in April 1999.

*20. Folder labeled "Income Tax" containing tax forms, correspondence with IRS, and notes on tax avoidance (Tennessee search-search warrant and plain view)*

Agent Groves was next asked about a file folder labeled "Income Tax," which the government lists as containing tax records for the 1999 tax year, W-2 and 1099-R forms for Mr. Dirr, the defendants' correspondence with the IRS for years 2000 and 2001, and notes on tax avoidance tactics. The parties argued about this folder but did not question Groves about its contents.

*21. Handwritten notes dated September 13, 2004 (Tennessee search–plain view)*

Agent Groves testified that he found handwritten notes dated September 13, 2004, in a file cabinet in the basement. The notes related to a conversation with David Miner about the IMF. Groves said that he seized the notes pursuant to the plain view doctrine because it was readily apparent to him that the notes related to the defendants' knowledge and willfulness. On

18

cross-examination, he stated that he had to read the notes to know their contents.

*22. IRS form 1040 instruction booklet for tax year 2000 (Tennessee search–search warrant)*

Agent Grove stated that he seized an IRS instruction booklet for form 1040 for tax year 2000 because it was a personal financial document related to filing a form 1040. On cross-examination, he acknowledged that the booklet contained no handwriting or calculations and that none of the worksheets contained therein had been filled out. He stated that the booklet was relevant to show the defendants' willfulness and knowledge.

*23. Folder labeled "HTS New Info (1/01)" (Tennessee search–search warrant and plain view)*

Agent Groves testified that he seized a folder labeled "HTS New Info (1/01)" that contained a 2001 tax statement that had been filed with the IRS, a receipt for the HTS package, and documents related to "sham" UCC filings. On cross-examination, he stated that another agent found the folder in a filing cabinet downstairs and determined that it could be seized pursuant to the plain view doctrine. Groves stated that he agreed with that agent upon his review of the folder. He admitted that he had to open the folder to know its contents. The tax statement that the defendant had sent to the IRS was on top. Groves cursorily thumbed through the folder, looking for financial records at the Dirrs' house and examined it more carefully after he left.

*24. Folder labeled "Cong. John Duncan" (Tennessee search–plain view)*

Agent Groves stated that he seized a manilla folder labeled "Cong. John Duncan" that contained a CRS Report with frequently asked questions on the federal income tax. Groves said that this document, which provided correct information on the tax laws, is relevant to the defendants' knowledge. The folder also contained an internet printout on a bill to eliminate federal taxes and a letter stating that the defendants were glad to meet the congressman. The

19

folder contained handwritten notes of questions that the Dirrs' had as well as a notation to contact the Kentucky branch of We the People. Groves stated that he seized this document due to the reference to We the People, which is an anti-tax foundation. He believed it to be relevant to his investigation of the defendants for income tax evasion. On cross-examination, Groves agreed that he had to read the notes and the CRS Report to realize their relevance.

25. *Folder labeled "Sales Tools" (Tennessee search–search warrant and plain view)*

Agent Groves testified that he seized a folder labeled "Sales Tools" that contained a Denzo pay stub and a blank 2000 W-4 form. These items were seized under the search warrant because they are personal financial records. Also in the folder was a document stating that Living in Paradise, the defendants' home business, goes sovereign. Groves believed that the notations relating to this revealed that the defendants were actively seeking tax-exempt status and recruiting others to do so. He said this document constitutes an admission by the defendants that they were evading taxes and is relevant to their willfulness. He stated that this information was readily apparent once he read the document. On cross-examination, Groves said that the pay stub and W-4 form were seized under the search warrant and the remainder of the folder was seized pursuant to the plain view doctrine. He admitted that he had to read the handwritten notation in order to determine its relevance.

26. *Folder labeled "Wallace Institute" (Tennessee search–plain view)*

Agent Groves stated that the found a manilla folder labeled "Wallace Institute," which contained internet printouts of research on Devvy Kidd's website. Groves said he was "mildly familiar" with Kidd, whom he characterized as a proponent of "tax scams." The folder also contained information from Larry Becraft, whom Groves said is a former attorney

associated with Bill Benson and a proponent of various "tax schemes." The folder contained information referring to the arguments of Irwin Schiff, an author who advocates filing a tax return for zero income in order to get all withholdings back. The folder contained a letter from Becraft, stating that the UCC "scam" involving writing names in all capital letters was ludicrous. Groves said he seized this research to show the defendants' knowledge because the Dirrs' had made false UCC filings. On cross-examination, Agent Groves admitted that he did not read through the folder at the Dirrs' home and that he did not open the folder or read the contents until later.

27. *Floppy disk labeled "HTS"* (South Carolina search–search warrant)

Agent Groves stated that he seized a floppy disk labeled "HTS" pursuant to the search warrant. When he later looked at the files contained on it, he found "go-by's" for the tax statements filed by the defendants in 1999, 2000, and 2001. He stated that this portion of the disk was retained because it contains financial documents. The disk also contains a Notice of Default in affidavit form. The Notice of Default states that because the government did not rebut the defendants' tax statements within sixty days, it is deemed to have defaulted. Groves said this portion of the disk was retained under the plain view doctrine because it shows the defendants' knowledge and willfulness.

28. *Three floppy disks, two CD's, and a DVD (South Carolina search–search warrant)*

Agent Groves testified that he seized three additional floppy disks, two CD's, and a DVD from Mr. Dirr's hotel room pursuant to the South Carolina search warrant. One floppy disk bore a blank label and contained only a response letter to the IRS. A floppy disk labeled "SCU-0110 (SCU-011AWRITEST.)" contained a completed "go-by" for the Notice of Default

21

that the defendants sent to the IRS. The third floppy disk was labeled "HTS-The Ultimate Identity Redemption" and contained information on strawmen and capitalization theories as well as "go-by's" and instructions for UCC filings of the type that the defendants had made. A CD-RW contained affidavits, a quit claim deed to the Lotus Group, a completed 2001 tax statement, and a file discussing how Global Prosperity and HTS "scammed" the Dirrs' out of $4,000. An unlabeled DVD contained the national free-citizen affidavits that the Dirrs filed and the document by which they rescinded all prior tax statements sent to the IRS. Finally, a CD labeled "Tax Answers the IRS Doesn't Want You To Know" contained information from David Miner.

## IV. FINDINGS OF FACT

Based upon the testimony at the evidentiary hearings and the exhibits filed with the briefs, the Court makes the following findings of fact:

On August 10, 2005, IRS Agent Brian Groves and seven other IRS agents executed a search warrant at the defendants' residence in Walland, Tennessee. As a result of the search, the agents seized numerous boxes of documents, books, recorded media (cassettes, CD's, etc.), and other items.

On August 16, 2005, Agent Groves executed a search warrant for Defendant Brett Dirr's Charleston, South Carolina hotel room. Agents seized approximately one box of items during this search.

All other factual findings will be made as a part of the analysis of the issues.

## V. ANALYSIS

22

The defendants challenge the validity and the execution of both the Tennessee and the South Carolina search warrants and request the return of all evidence seized in these two searches. With regard to the validity of the warrants, they argue that both warrants were not sufficiently particular with regard to the items to be seized. They assert that this lack of particularity resulted in the seizure of thousands of irrelevant items under the warrants and, in essence, converted the search warrants into unconstitutional "general warrants." Thus, they maintain that all the evidence seized pursuant to the warrants must be suppressed. The defendants also challenge the validity of the South Carolina warrant aside from its lack of particularity.

Secondly, the defendants object to the execution of both warrants, arguing that numerous items were seized outside the scope of the warrants and not within the plain view doctrine. They also challenge the execution of the Tennessee warrant, alleging numerous violations of Rule 41, Federal Rules of Criminal Procedure.

Third, the defendants object to the warrantless and unwarned statements of Mr. Dirr on August 11, 2005. Finally, they ask for the return of all items seized under the warrants. The Court will consider each of these issues in turn.

## A. Validity of the Search Warrants

### 1. Particularity

The Fourth Amendment requires that "[n]o warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. am. IV. The particularity

23

requirement forecloses the opportunity for a general search and "prevents the seizure of one thing under a warrant describing another" by restricting the discretion of the executing officer. Marron v. U.S., 275 U.S. 192, 196 (1927). "However, the degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought." United States v. Henson, 848 F.2d 1374, 1383 (6th Cir. 1988). The description of items to be seized pursuant to a search warrant is sufficient "'if it is as specific as the circumstances and the nature of the activity under investigation permit.'" Id. (quoting United States v. Blum, 753 F.2d 999, 1001 (11th Cir. 1985)).

### (i) Particularity of the Tennessee Search Warrant

In the present case, the Tennessee search warrant permitted the seizure of "the property listed in Attachment B which is attached hereto and incorporated by reference herein[.]" Attachment B to the Tennessee search warrant lists four categories of items to be seized: (1) personal financial records from 1999 through August 2005, (2) business financial records from 1999 through August 2005, (3) computer and electronic equipment containing financial information relating to the defendants or the Lotus Group, and (4) all computer instructions or programs. Within these categories, non-exclusive examples are listed.

The Court finds the items listed in Attachment B to the Tennessee search warrant to be sufficiently particular given the nature of the activity being investigated. Here, Agent Groves was investigating the defendants for tax evasion and failure to file tax returns for the years 1999 through 2005. The affidavit to the Tennessee search warrant states that Agent Groves was aware of Mr. Dirr's income during the relevant years from W-2 forms and a "taxable distribution" to Mrs. Dirr in 1999 from IRS records. The affidavit also reveals that Groves had

24

reviewed affidavits and correspondence from the defendants to the IRS stating their belief that they had no income tax liability and the reasons in support thereof. In the search warrant affidavit, Agent Groves related that the defendants had transferred ownership of their home to the Lotus Group for minimal consideration. Grove's affidavit relates that the defendants also transferred ownership of their vehicles to the Lotus group. Finally, the affidavit states Grove's belief that the defendants prepared their correspondence to the IRS and other documents on a computer. After reviewing this information in the affidavit, the Court finds that the categories of items to be seized under the Tennessee search warrant are sufficiently particular to prevent seizure of items not specified under the warrant.

*(ii) Particularity of the South Carolina Search Warrant*

The defendants also contend that the South Carolina search warrant was not sufficiently particular with regard to the items to be seized. Specifically, they argue that the provision permitting seizure of "anti-government rhetoric" was overly subjective and open to interpretation by the executing officer.

The South Carolina search warrant permitted seizure of the "property specified," for which the warrant directs "(See Attachment B)." Attachment B of the South Carolina search warrant lists the following categories of items to be seized: (1) Computer and electronic equipment and/or stored data containing financial information on the defendants or the Lotus Group, (2) instructions or programs which are capable of being interpreted by a computer, (3) written or printed material providing instructions for the operation of a computer or software, (4) "written or printed material which contains financial information relating to Brett Dirr, Renee Dirr, or the Lotus Group and/or anti-government rhetoric." The first and second categories

contain lists of non-exclusive examples of the types of items being sought. The Attachment also states that the officer may seize a computer if he or she cannot access or copy the information during the search.

When seeking the South Carolina search warrant, Agent Groves presented a new affidavit supporting the South Carolina search warrant and the affidavit he had filed in support of the Tennessee search warrant. In addition to the information detailed above with regard to the Tennessee search warrant, Groves stated in the new affidavit that in his search of the defendants' home, he had discovered "numerous printouts from the internet and email discussions during 2003 and 2004 pertaining to anti-government rhetoric, including but not limited to, the lack of authority and jurisdiction of the Internal Revenue Service." The affidavit stated that the Dirrs' computer was not discovered during the search of their home but that Groves learned that Mr. Dirr had relocated to South Carolina to start a new job days prior to the search of the residence. Groves also related in the affidavit that he met with Mr. Dirr in the hotel room Groves was seeking to search and at a local fast-food restaurant. At the first meeting, Groves saw a desktop computer in Mr. Dirr's hotel room. On the following day, Mr. Dirr presented him with internet printouts that Mr. Dirr had printed the evening before. After reviewing this information (and the information contained in the first affidavit, which was also presented to the magistrate judge when the agent sought the South Carolina search warrant), the Court finds that the first three categories and the first portion of the fourth category relating to written or printed financial information are sufficiently particular given the nature and circumstances of Agent Groves' investigation.

The defendants argue that the category "anti-government rhetoric" is open to the

subjective interpretation of the executing officer and, as such, does not provide sufficient restraint. The government contends [Doc. 98] that "anti-government rhetoric" is as specific as the nature of the activity under investigation would permit. It maintains that some items relevant to the defendants' willfulness and knowledge regarding tax evasion were not "'anti-tax' *per se*" such as the materials relating to declaring oneself a "sovereign free citizen" or to avoiding government contact by using an International Driving Permit. The government argues that these materials could be put to an anti-tax purpose by someone wanting to get around the tax laws.

The Court finds that the term "anti-government rhetoric" is overly broad in the context of the circumstances of the search of Mr. Dirr's South Carolina hotel room, as it could extend to written or printed information that did not relate to the IRS investigation of the particular tax crimes at hand. "[W]hat . . . history indispensably teaches is that the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain." Stanford v. Texas, 379 U.S. 476, 485 (1965) (holding that the search warrant's authorization of the seizure of "literary material-'books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas, and the operations of the Communist Party in Texas'" to violate the particularity requirement). Although the government is correct that some anti-government materials that were not also anti-tax materials *could be* used to subvert the tax laws, the Court finds the term "anti-government rhetoric," without other limiting language, to be overly broad because it includes so many potential materials that are unrelated to the instant case. Nevertheless, the overbreadth of this single portion of a category does not require the

27

suppression of all evidence seized under the warrant as the defendants contend. Instead, "the remedy for an overly broad warrant is to sever the overly broad portions of the warrant from those portions that are sufficiently particular." United States v. Ford, 184 F.3d 566, 578 (6th Cir. 1999).

The government argues that only two items were seized from Mr. Dirr's hotel room solely pursuant to the "anti-government rhetoric" language in the search warrant–two books entitled the Organic Sovereign American Freeman Compendium, volumes 1 and 2.[3] The return on the South Carolina search warrant states that the officers seized the "Freeman Companion" volumes I and II from the closet. Officer Groves did not testify about these books at the January 22 hearing, but at the earlier December 22, 2008 hearing, the government argued that these books contained "tax-protestor arguments" and were seized pursuant to the plain view doctrine. The Court finds that these two books were improperly seized under the warrant, as they do not fall within any of the other categories of items listed in Attachment B. The Court will address whether these two books could properly be seized under the plain view doctrine in the subsequent section dealing with the execution of the search warrants. The Court finds that the improper seizure of these two books under the search warrant does not serve to convert the search warrant into a "general warrant."

---

[3] The government also maintains that two file folders–one unlabeled, containing business cards and correspondence between the defendants and David Miner, and a second labeled "Tax Answers Workbook," containing correspondence between the defendants and David Miner and "Ray W." and materials discussing illegal tax evasion tactics–could have been seized as written or printed material containing the defendants' financial information *or* as "anti-government rhetoric." The Court will consider whether the seizure of these folders was within the scope of the South Carolina search warrant as financial information in section B(1)(i) to follow.

28

*(iii) Existence of Judicial Districts*

Mrs. Dirr argues [Doc. 100] that both search warrants are insufficiently particular because they describe the defendants' home and the South Carolina hotel room as being located in places that do not exist, namely the Eastern District of Tennessee and the District of South Carolina respectively. She argues that a United States District Court has no jurisdiction over the defendant's home, which is located in the State of Tennessee, or Mr. Dirr's hotel room, which is located in the State of South Carolina. She maintains that the descriptions on the search warrants that the defendant's home is located in the Eastern District of Tennessee and that Mr. Dirr's hotel room is located in the District of South Carolina fail the particularity requirement by placing the locations to be searched in places that do not exist.

The Court finds this argument to be an offshoot of the defendant's argument that the charges should be dismissed because District Court lacks jurisdiction in this case. The Court rejected this argument in its prior Report and Recommendation [Doc. 81], which the District Court has subsequently accepted [Doc. 91] in whole. The District Court has jurisdiction over the subject matter of this case because the indictment alleges violations of federal law that occurred "in the Eastern District of Tennessee and elsewhere." See 18 U.S.C. § 3231. The defendant acknowledges that her home is located in Blount County, Tennessee. Blount County, Tennessee, is in the Eastern District of Tennessee. 28 U.S.C. § 123(a)(1). The defendant also acknowledges that the hotel at which Mr. Dirr was staying in August 2005 is in Charleston County, South Carolina. Charleston County, South Carolina, along with all other counties in South Carolina, is in the District of South Carolina. 28 U.S.C. § 121(1). Accordingly, the particularity of the search warrants is not diminished by the statements that the locations to be searched are found

29

within the named judicial districts.

## 2. Validity of the South Carolina Search Warrant

The defendants contend that the South Carolina search warrant is facially invalid because (1) it contains no statement of probable cause, (2) it fails to list a crime,[4] (3) it does not give a time frame for execution, (4) it fails to name the judicial officer to whom the warrant is to be returned, and (5) it bears no case number. The government responds that the South Carolina search warrant was properly issued. Alternatively, the government argues that if the search warrant is invalid, the good faith exception pursuant to United States v. Leon, 468 U.S. 897 (1984), bars suppression of the evidence.

The South Carolina search warrant states, in pertinent part:

In the Matter of the Search of Room 113 at The Extended Stay America 5059 North Arco Lane North Charleston, SC[.]

To: Brian D. Grove and any Authorized Officer of the United States Affidavit(s) having been made before me by Brian D. Grove who has reason to believe that . . . on the premises known as . . . Room 113 at The Extended Stay America 5059 North Arco Lane North Charleston, SC (See Attachment A for more detailed information) in the Judicial District of South Carolina there is now concealed certain person or property, namely . . . (See Attachment B)[.]

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before

---

[4]Mrs. Dirr first raised the issue of the South Carolina search warrant's failure to list a crime in the oral arguments relating to this warrant.



_____ (not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to _____ as required by law.

The search warrant was signed on August 16, 2005, at 11:36 a.m., by a United States Magistrate Judge.

### (i) Probable Cause for South Carolina Search Warrant

The defendants fault the South Carolina search warrant for failing to show the basis for probable cause on the warrant's face. Mr. Dirr argues that the warrant's failure to incorporate the affidavit is constitutionally fatal. He maintains that Agent Grove's affidavit was neither attached to nor incorporated in the warrant. Accordingly, he argues that nothing on the warrant itself shows that probable cause exists to permit the issuance of the warrant. The government responds that no statement of probable cause is required on the face of the warrant. Instead, it contends that the issuing judge must certify that he or she found probable cause to issue the warrant. It argues that the South Carolina warrant contains such a statement.

The Fourth Amendment requires that no warrant shall issue except upon a finding of probable cause. Although the Amendment specifies that the warrant must describe with particularity the place to be searched and the items to be seized, the Amendment itself gives no guidance on how the probable cause finding must be documented. Cf. Groh v. Ramirez, 540 U.S. 551, 557 (2004) (holding that the "Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents"). The Supreme Court has reasoned that "[t]he

Fourth Amendment does not require that the warrant set forth the magistrate's basis for finding probable cause, even though probable cause is the quintessential 'precondition to the valid exercise of executive power.'" United States v. Grubbs, 547 U.S. 90, 98 (2006) (holding that if the Fourth Amendment does not require the basis for probable cause, it likewise does not require the warrant to state the triggering condition for an anticipatory search warrant).  Although Mr. Dirr cites to Grau v. U.S., for the proposition that a search warrant is facially invalid if it does not list the particular grounds for its issuance, in Grau, the Supreme Court declined to address the allegation that the search warrant failed to state the grounds for probable cause because it found that the supporting affidavit did not provide probable cause.  287 U.S. 124, 127 (1932), abrogated by Brinegar v. U.S., 338 U.S. 160, 174 n.13 (1949) (rejecting the dictum in Grau that probable cause must be comprised of evidence that would be admissible at trial).

As noted by the government, there is also no general statutory requirement that the basis for the judge's probable cause finding appear in the search warrant.  Rule 41(d)(1) of the Federal Rules of Criminal Procedure provides that "[a]fter receiving an affidavit or other information, a magistrate judge . . . must issue the warrant if there is probable cause to search for and seize a person or property[.]"  With regard to the contents of a search warrant, Rule 41 requires a warrant to (1) "identify the person or property to be searched," (2) "identify any person or property to be seized," and (3) "designate the magistrate judge to whom it must be returned."  Fed. R. Crim. P. 41(e)(2).  The rule also mandates that the search warrant specify the time for the execution of the warrant and direct the executing officer to return the warrant to the designated magistrate judge.  Fed. R. Crim. P. 41(e)(2).  Notably, Rule 41 does not require a statement of the basis for the Magistrate Judge's probable cause finding to appear on the face of

the search warrant. Rule 41(c) formerly required a search warrant to "state the grounds for its issuance and the names of the persons whose affidavits have been taken in support thereof[,]" but this requirement was removed in the 1972 amendments to Rule 41. United States v. Osborne, 512 F. Supp. 413, 415 (E.D. Tenn. 1980) (comparing requirements for an inspection-warrant to those of former Rule 41(c)), affirmed 657 F.2d 270 (6th Cir. 1981). The reason for deleting this requirement from Rule 41 was "to eliminate unnecessary paperwork." Id. (citing 3 Wright, Federal Practice and Procedure: Criminal, 673 n.76.1 (1979)). Thus, the former requirement that the search warrant state the grounds for its issuance on its face was not constitutionally mandated. Citing to Groh v. Ramirez, 540 U.S. 551 (2004), Mr. Dirr argues [Doc. 99] that the South Carolina search warrant is invalid because it neither states the grounds for probable cause on its face nor incorporates and attaches the affidavit. As pointed out by the government, the Supreme Court in Groh was analyzing the search warrant's failure to meet the *particularity* requirement, not the probable cause requirement, of the Fourth Amendment. See id. at 557-58. "The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." Id. at 557. The Court's description of the probable cause finding in the search warrant in Groh appears to be strikingly similar to that contained in the South Carolina search warrant. See id. at 555 (noting that the search warrant "recite[d] that the Magistrate was satisfied the affidavit established probable cause to believe that contraband was concealed on the premises, and that sufficient grounds existed for the warrant's issuance"). In that respect, the Supreme Court found that the Groh search warrant "was based on probable cause and supported by a sworn affidavit[.]" Id. at 557. In other words, the fact that the affidavit was not incorporated in and/or attached to the search warrant did not affect the

33

sufficiency of the probable cause finding, only the sufficiency of the warrant's particularity. Accordingly, the undersigned finds that unlike the particulars of the place to be searched or the items to be seized, the grounds for probable cause do not have to be set out on the face of the search warrant nor does the affidavit have to be expressly incorporated by reference in lieu of the probable cause appearing on the warrant's face.

Finally, Mrs. Dirr argues [Doc. 110] that the probable cause must appear on the face of the search warrant for the benefit of the person whose property is being searched. The Court agrees that one of the purposes of the Fourth Amendment's *particularity requirement* is to assure the person whose property is being searched "'of the lawful authority of the executing officer, his need to search, and the limits of his power to search.'" Id. at 561 (quoting United States v. Chadwick, 433 U.S. 1, 9 (1977), abrogated on other grounds, California v. Acevedo, 500 U.S. 565 (1991)). That reason, along with the need to prevent general searches, is the basis for requiring that the place to be searched and the property to be seized be set out on the face of the warrant. Groh, 540 U.S. at 561. On the other hand, the Fourth Amendment requires that a judicial officer, not the individual whose property is the subject of the search, make the determination of whether probable cause exists to issue the search warrant:

> The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home.

34

McDonald v. U.S., 335 U.S. 451, 455-56 (1948); see also Groh, 540 U.S. at 560.

In the present case, the South Carolina search warrant expressly states that the issuing Magistrate Judge found probable cause based upon the affidavits. In their supplemental filings challenging the validity of the South Carolina warrant, the defendants do not challenge the sufficiency of the affidavits to establish probable cause.[5] The Court finds that the issuing judge did not have to list the information forming the basis of the judge's probable cause finding on the face of the search warrant, particularly when the judge stated that he found probable cause based upon the affidavits. Accordingly, the Court finds that the South Carolina search warrant properly states that the issuing judge found probable cause based upon the agent's affidavits, to which the search warrant expressly refers.

*(ii) Specification of the Crime*

The South Carolina search warrant does not specify on its face that the items to be

---

[5]In his supplemental reply brief [Doc. 109] arguing that the Leon good faith exception should not be applied to prevent suppression of the evidence, Mr. Dirr asserts for the first time that Agent Groves failed to provide a substantial basis from which the issuing judges could determine probable cause. He also maintains that the "affidavit"–without stating which affidavit– was a "'bare-bones' affidavit." At the October 29, 2008 hearing, Mr. Dirr's counsel affirmatively stated that the Tennessee search warrant was valid in its inception and that the defendant was only challenging its execution. The Court also notes that the affidavit in support of the Tennessee search warrant was also filed in support of the South Carolina search warrant along with a second, new affidavit that included the evidence found at the Dirrs' residence and referenced the affiant's conversation with Mr. Dirr in his hotel room. The Court will not permit the defendants to change course at this juncture and raise in an indirect manner the argument that the affidavits did not provide probable cause to issue the search warrants. Moreover, if it were to consider the issue, the Court would find that the affidavits amply provide probable cause for the issuance of the search warrants in this case.

seized are evidence of any crime. Instead, it merely states that there is probable cause to believe

that the property sought is at Mr. Dirr's hotel room. The government argues that nothing in

Rule 41(c) requires that the warrant refer to the violation of any particular statute. It also asserts

that in this case, the issuing judge was aware of the statutes that the affiant believed were being

violated because those statutes were set out in the search warrant application. Finally, it

maintains that Attachment B's list of items for which the agents could search was sufficiently

particular to limit the agents even without a reference to a specific crime.

Whether the alleged crime has to be set out in the search warrant turns upon

whether the assertion of the crime committed is part of the probable cause finding by the judicial

officer (i.e., the judge determines that there is probable cause that evidence of a certain crime

will be at a certain location) or is an element of the information needed to fulfill the particularity

requirement (i.e., the warrant must state that the officers are permitted to seize evidence of a

particular crime). The government points the Court to Judge Batchelder's dissent in United

States v. Brown, 49 F.3d 1162, 1173-74 (6th Cir. 1995), as the sole authority that it was able to

locate on this question.

In Brown, the majority opinion holds that the seizure of items not specifically

named in the search warrant did not violate the Fourth Amendment because those items were

reasonably related to the offense forming the basis for the search warrant. Id. at 1169. Judge

Batchelder, on the other hand, took issue with the validity of the search warrant, finding that it

failed to fulfill the particularity requirement:

> There are two aspects to the particularity requirement.
> First, the warrant must provide a particular description of the
> places to be searched and the things to be seized. Marron v.
> United States, 275 U.S. 192, 195-96 . . . (1927). Second, the

36

> warrant should provide a sufficiently detailed explanation of the suspected criminal activity that occasions the search to enable the executing officers to limit their search to evidence relating to that criminal activity and to inform the subjected individual what property the officers are entitled to take. Rickert v. Sweeney, 813 F.2d 907, 909 (8th Cir. 1987).

Id. at 1173-74 (Batchelder, J., dissenting). In this regard, Judge Batchelder found that the listing of a specific statute could fulfill this second aspect of the particularity requirement but that a reference to several, broad statutes alone could not. Id. Requiring the statement of the crime in the search warrant (or in an incorporated affidavit or attachment) makes sense if it is to be a limit on the executing officer's authority to seize items under the search warrant. As stated above, "[a] warrant assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." Chadwick, 433 U.S. at 9. Moreover, "search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found." Mays v. City of Dayton, 134 F.3d 809, 814 (6th Cir.) (holding the absence of evidence in the *affidavit* that the property owner personally committed a crime did not invalidate the search warrant) (citing Zurcher v. Stanford Daily, 436 U.S. 547 (1978)), cert. denied, 524 U.S. 942 (1998).

In the present case, the South Carolina search warrant does not describe the criminal activity occasioning the search, nor does it list any statutes. The government argues that the description of the items to be seized in Attachment B, which was specifically incorporated in the search warrant, fulfills the particularity requirement in this case, even in the absence of a statement of the crime. The dissent in Brown relates that the specificity in the items to be seized can make up for a lack of particularity in the crime:

37

> Inadequacy of the warrant in one of these respects may be compensated for by specificity and completeness in the other, but to be valid, the warrant must contain the information necessary to properly limit the search and seizure. Therefore, a warrant is facially invalid if it neither particularly describes the places to be searched and the things to be seized nor adequately describes the suspected criminal conduct to which the search is related.

Brown, 49 F.3d at 1174 (Batchelder, J. dissenting) (internal citation omitted). The Court agrees with the government that the list of items to be seized in Attachment B (with the exception of "anti-government rhetoric," which the Court has already determined should be stricken as overly broad) is sufficiently specific in enumerating the items to be seized that it compensates for the absence of a description of the crime or crimes on the face of the search warrant.

If the District Court were to find that the statement of the crime occasioning the search was a component of the probable cause finding rather than the particularity requirement, this Court has already found that the probable cause for issuing the search warrant does not have to be set out on the face of the warrant. Although, as discussed above, the defendants do not challenge the sufficiency of probable cause to support the issuance of the search warrant, the Court finds that the supporting affidavits contain ample descriptions of and citation to the crimes alleged for the issuing judge to have found probable cause that evidence of a specific crime would be found at the location named in the warrant.

### (iii) Other Rule 41 Violations

The defendants also challenge [Docs. 99 and 110] the validity of the South Carolina search warrant because it does not identify Mr. Dirr on its face, list the time in which it must be executed, name the judge to whom the return must be made, or contain a case number.

38

The government acknowledges [Docs. 98 and 108] that the South Carolina search warrant does not comply with Rule 41's requirements that it list the time frame for execution and state the judge to whom the return is to be made. The government argues that these are ministerial errors that do not require suppression of the evidence, especially in light of the fact that the warrant was executed on the same day it was sought and the return was made. The government maintains [Doc. 108] that the defendants' assertion that the warrant violates Rule 41 because it fails to identify Mr. Dirr as the occupant of the hotel room and it lacks a case number is without merit.

Mr. Dirr contends without further elaboration that the search warrant failed to identify him on its face. Rule 41(e)(2) requires that the search warrant "identify the person or property to be searched, [and] identify any person or property to be seized[.]" The South Carolina search warrant identified the property to be searched–Mr. Dirr's hotel room–and the property to be seized, which was listed in Attachment B. The Court has before it no evidence that Mr. Dirr's person was searched or seized during the execution of the search warrant. The Court finds no violation of Rule 41 with respect to the warrant's failure to name Mr. Dirr as the occupant of the hotel room in question. Similarly, as noted by the government, the warrant did not have to have a case number, which relates only to the court's internal procedures and has nothing to do with the search warrant's validity.

On the other hand, Rule 41 does require that a search warrant "designate the magistrate judge to whom it must be returned[,]" command the executing officer to "execute the warrant within a specified time no longer than ten days[,]" and require that the warrant be executed during the daytime unless the judge expressly permits execution at night for good cause. Fed. R. Crim. P. 41(e)(2)(A)(i)-(ii). The South Carolina search warrant does not specify

39

the date by which the search had to be made, although it does state that the search cannot be made after ten days, and does not indicate whether the search is to be made during the day or at night. Also, the space for designation of the person to whom the warrant is to be returned has been left blank.

"'[V]iolations of Rule 41 alone should not lead to exclusion unless (1) there was "prejudice" in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.'" United States v. Searp, 586 F.2d 1117, 1125 (6th Cir. 1978) (quoting United States v. Burke, 517 F.2d 377, 386-87 (2d Cir.1975)), cert. denied, 440 U.S. 921 (1979); see also Frisby v. United States, 79 F.3d 29, 32 (6th Cir. 1996) (holding that "ministerial" violations of Rule 41, such as the failure to leave a copy of the warrant and a receipt for the property seized, do not require application of the exclusionary rule unless the defendant can show prejudice resulting from the violation).

The Court discerns no prejudice from the warrant's failure to list the date, time, or judge to whom the return is to have been made. The warrant reflects that it was issued on August 16, 2005, at 11:36 a.m. The return reveals that the warrant was executed that same day. Although the record does not show the time that the warrant was executed, the defendants do not even allege that it occurred after 10:00 p.m. The return is signed by the same Magistrate Judge who issued the warrant. The Court finds nothing to suggest that the search would have occurred differently had the date, time, and name of judge been included in the warrant.

Moreover, there is no evidence that the failure to include the date, time, or name of the judge to whom the warrant should be returned was the product of intentional or deliberate

40

disregard.  Mrs. Dirr argues [Doc. 110] that the number of Rule 41 violations reveal an

intentional and deliberate disregard of Rule 41.[6]  To the contrary, the Court finds that the record

shows that the warrant was executed in a timely fashion (the day the warrant issued) and

returned to the issuing judge.  Accordingly, the Court finds that the absence of the

aforementioned information, although required by Rule 41, does not render the South Carolina

search warrant invalid.


## B.  Execution of the Search Warrants

---

[6]As a part of her contention that Agent Groves had no reason to believe that the South
Carolina search warrant was valid and, thus, did not act in good faith under United States v.
Leon, 468 U.S. 897 (1984), Mrs. Dirr argues [Doc. 110] that the South Carolina search warrant
and return contains or precipitates ten Rule 41 violations.  The Court has already rejected her
argument that the property to be searched was not located in the district.  In addition to the Rule
41 violations as to the date, time, and name of judge found by this Court, Mrs. Dirr alleges (1)
that the issuing judge did not read the affidavit because he missed several typographical errors as
to the date that the Tennessee search warrant was executed, (2) that the South Carolina affidavit
was not filed with the clerk of court, (3) the failure of a second agent to sign the inventory, (4) a
receipt for the property taken was not left with Mr. Dirr, and (5) the return on the warrant was
not made promptly because it was returned fourteen days after the warrant was executed.  The
Court rejects these contentions in the summary fashion in which they are made, finding them to
be either unsupported by the evidence or the product of an incorrect interpretation of Rule 41.
See United States v. Dudek, 530 F.2d 684, 687 (6th Cir. 1976) (holding that the failure to file an
inventory at all "does not violate any fundamental rights of the defendants").

Mrs. Dirr also contends that the date and time the warrant was *executed* was not noted on
the warrant.  Rule 41 (f)(1)(A) requires that the executing officer note the date and time of
execution on the search warrant.  The Court finds that although the search warrant does not bear
the date and time of execution, the defendants have not been prejudiced.  The search warrant
return contains the date that the search warrant was executed.  Although the return does not
provide the time of execution, the defendants did not cross-examine Agent Groves at the January
22 hearing about the time at which the search warrant was executed nor have they alleged that
the warrant was executed at night.  The Court finds that to the extent that the failure to note the
date and time of the execution on the face of the warrant is a technical violation of Rule 41, this
single additional violation does not add significantly to the level of violations such that the Court
can infer that they were intentional or deliberate.

41

The defendants challenge the execution of both search warrants, arguing that the executing officers seized thousands of items that were outside of the scope of the search warrants, thereby converting the warrants into "general warrants." The defendants argue that the agents improperly seized over ten boxes of materials, many of which were irrelevant to the charges, from their home and Mr. Dirr's hotel room. Additionally, Mrs. Dirr argues in her supplemental reply brief [Doc. 110] that the agents' search of her barn, garage, and vehicles exceeded the scope of the Tennessee search warrant, which only authorized a search of her residence. The defendants also fault the execution of the Tennessee search warrant because (1) the agents did not present Mrs. Dirr with the search warrant at the inception of the search, (2) the affidavit was not provided to Mrs. Dirr at the time of the search, (3) non-federal officers were present during the search, and (4) Agent Groves improperly prepared the inventory of the items seized.

The government contends that all retained items were properly seized either pursuant to the search warrants or the plain view doctrine. It also maintains that the Tennessee search warrant was properly executed.

**1. Seizure of Items Outside the Scope of the Warrants**

The defendants allege that agents seized numerous items that were not within the scope of the search warrants. In their motion to suppress [Doc. 55], the defendants alleged that the agents took over ten boxes of items in the two searches, but the defendants did not specify the items that they claim were not within the scope of the warrants. The government responded [Doc. 65] that the items were seized appropriately either under the warrants, primarily as

42

personal financial documents or financial business records, or under the plain view doctrine. It also noted that "several" of the ten boxes of items the defendants had been permitted to inspect in discovery contained items from financial institutions or the IRS's administrative files and were not items seized in the searches. At the October 29, 2008 hearing, counsel for Mr. Dirr listed some items which he argued were illustrative of those items improperly seized, such as an instruction manual for a blender, dental records, and student directories from 1987 and 1988, but he did not have a complete list. AUSA Atchley noted that, in attempting to work quickly to reduced the length of time in an individual's home, agents sometimes inadvertently seized items not within the scope of the warrant. On the other hand, he maintained that some of the items challenged by the defendants were evidence of the defendants' willfulness, an element of the statutes at issue. At the conclusion of this hearing on the following morning, the parties agreed to meet and go through the boxes of documents to see if the issue could be resolved, at least in part, without the Court's involvement.

As described in the procedural history at the beginning of this report, the aforementioned meeting fell short of a resolution. At the December 22, 2008 hearing on the status of the suppression issue, the government returned three boxes of items to the defendants, but the defendants continued to object that the seven to eight remaining boxes should also be returned. The Court set a suppression hearing on the matter and ordered the government to itemize the remaining items, telling whether they were seized under the search warrant or pursuant to the plain view doctrine. At the beginning of the January 22, 2009 suppression

43

hearing, the government returned 197[7] items to the defendants. The government maintained that the "vast majority" of these items were properly seized but that it was returning the items to avoid the expenditure of judicial resources on them because it did not intend to use them at trial. The hearing then proceeded on the forty-seven remaining items listed in Exhibit C to United States' Notice of Compliance with Order Regarding Seized Items [Doc. 92], eight of which the defendants did not contest the propriety of their seizure on the basis of exceeding the scope of the search warrants. Of the thirty-nine items still at issue, the government alleged that thirteen, plus portions of five others, were seized pursuant to the plain view doctrine.

The defendants argue that (1) items were improperly seized under the search warrants, (2) the listed items could not have been seized under the plain view doctrine, and (3) the seizure of so many items under the plain view doctrine in addition to the large number of items improperly seized under the search warrants converted the search warrants into general warrants. Mrs. Dirr also objects to the photographs of her barn, garage, and vehicles because she claims that the search of these areas exceeded the scope of the Tennessee search warrant.

*(i) Contested Items Seized Under the Search Warrants*

The defendants contend that agents seized twenty-four items consisting of binders, folders, floppy discs, CD's, a DVD, an IRS form 1040 instruction booklet, business cards, and a checkbook outside of the scope of the search warrants. The defendants argue that these items are not financial records, contain information that the IRS already had or that the

---

[7]These items consisted of the 192 items listed in Exhibit D to United States' Notice of Compliance with Order Regarding Seized Items [Doc. 92] and five additional items returned on the day of the hearing.

agents could have obtained from another source, or contained information outside of the time frame set out in the warrants. Whether these items fall within the scope of the search warrants is a factual determination for the Court to make based upon the categories of items for which the agents were searching and on Agent Groves' testimony describing the item. The Court will briefly examine each of these items.

The defendants argue that the agents improperly seized an unlabeled blue binder containing copies of affidavits sent to public officials and correspondence with IRS.[8] They maintain that the items contained within the binder are not financial documents or records. They also contend that the documents contained within this binder are either part of the public record because they were sent to public officials or are documents in the possession of the IRS. They assert that the Fourth Amendment's protection of privacy interests prevent agents from seeking a search warrant to seize items from a home that they could seize from some public venue or that are already in the possession of the government. The government argues that these items are financial records properly seized under the search warrant. It also maintains that the possibility that agents could have obtained these documents from other sources does not negate the agents' basis to seize them under the present search warrant. It asserts that the defendants' possession of these items (correspondence with the IRS, etc.) is relevant to their willfulness in committing tax evasion.

The blue binder in question contained affidavits that the defendants had filed with the IRS proclaiming themselves freeborn citizens without tax liability. The Court finds that this

---

[8]This binder is item number three in the summary of Agent Grove's testimony in this report and item number five in Exhibit C of the United States' Notice of Compliance With Order Regarding Seized Items [Doc 92].

binder was properly seized under the Tennessee search warrant because it contained personal

financial records relating to the defendants' payment of or failure to pay taxes. In support of his

contention that agents cannot use a search warrant to seize items within his home or hotel room

that are already public record, Mr. Dirr argues that a search warrant is not necessary for officers

to search public records in a public place. See Davis v. U.S., 328 U.S.582, 589, 593 (1946). He

maintains that because a warrant is not necessary to seize public documents and because an

officer must justify his need for a search warrant, the agents in the present case could not justify

the seizure of "public records" under the search warrant. The reasoning in Davis does not apply

to the instant case. In Davis, the Court observed that "[w]e are dealing here not with private

papers or documents, but with gasoline ration coupons which never became the private property

of the holder but remained at all times the property of the government and subject to inspection

and recall by it." Id. at 588. In contrast, the defendants' personal copies of items that might also

be in the public record or maintained in some public or private office and which they kept in

their home or in Mr. Dirr's hotel room were not the property of the government or subject to

inspection by the government at any time. The fact that the government could have obtained

these documents from another source or that it already had copies of these documents is not a

basis for finding them outside the scope of the search warrant.

The defendants challenge the seizure of a file folder labeled "Strawmen/Women

Birth Certificates"[9] because these are not personal financial documents and because the

_____

[9]This folder is item number ten in the summary of Agent Grove's testimony contained in
this report and item number thirteen in the government's Exhibit C [Doc 92]. The government
argues that the handwritten notes found in this folder were seized pursuant to the plain view
doctrine, which will be discussed in the next section.

46

government either already had these documents or could have obtained them from another source. At the January 22 hearing, Agent Groves testified that the folder contained fraudulent UCC financial statements that the defendants had filed in order to prevent the collection of taxes. The Court finds that these UCC documents were properly seized as personal financial records under the Tennessee search warrant. As discussed above, the fact that the government possibly could have obtained these documents from another source does not negate the agents' ability to seize them under the search warrant.

Next, the defendants assert that agents improperly seized folders labeled "Quit Denzo Prep" and "Navarus Automation,"[10] because the papers contained within these folders were not financial records and because some of the documents were already in the possession of the IRS. Agent Groves testified that anything related to Mr. Dirr's employment was a personal financial record because such documents could be used to contact the defendant's employers and were relevant to the calculation of taxes. Attachment B of the Tennessee search warrant lists "employment contracts" and "employment agreements" as examples of personal financial records. Although Agent Groves did not list the types of documents contained within the folders, the Court finds that Mr. Dirr's employment records would be personal financial records in the context of a search for evidence of tax evasion. Accordingly, the Court finds that these folders were properly seized as personal financial records of the defendants.

The defendants argue that the seizure of a folder labeled "Dana-IRS Stuff"[11]

---

[10]These folders are item numbers eleven and twelve in the summary of Agent Grove's testimony in this report and item numbers fourteen and fifteen in Exhibit C [Doc 92].

[11]This folder is item number thirteen in the summary of Agent Grove's testimony in this report and item number eighteen in Exhibit C [Doc 92]. This folder also contains

permitted agents to "get into the mind[s]" of the defendants, which was not allowed by the search warrant.  Agent Groves testified that the folder contained correspondence relating to the Lotus Group and documents relating to placing assets in trusts.  The Court finds that the contents of this folder fall within the category of personal financial records, because they relate to the Lotus Group, which the government alleges was used to conceal assets.  Attachment B to the Tennessee search warrant states that personal financial records comprise "personal documents showing the acquisition, secretion, transfer, and/or concealment of assets."  Moreover, the defendants' argument that the seizure of this folder allowed agents to know what the defendants were thinking is not a basis for suppressing otherwise properly seized evidence.

The defendants object to the seizure of two blue binders[12] containing correspondence from the IRS in response to the defendants' Freedom of Information Act (FOIA) requests, correspondence with IRx Solutions regarding Mr. Dirr's IRS files, and correspondence with David Miner.  They argue that these binders contain information already in the possession of the IRS.  The government contends that these binders were properly seized as personal financial records.  Agent Groves testified that the FOIA requests in these binders related to eliminating or correcting a tax and to learning the names of IRS employees in relation to decoding one's Individual Master File (IMF).  He stated that any correspondence with the IRS related to finances and determining tax liability.  The Court finds that these binders were

_____

correspondence and notes on the defendants' research into programs promoting tax avoidance, which the government alleges were seized under the plain view doctrine.  The plain view doctrine will discussed in the next section.

    [12]These binders are item numbers fourteen and fifteen in the summary of Agent Grove's testimony in this report and item numbers nineteen and twenty-one in Exhibit C [Doc 92].

48

properly seized as the personal financial records of the defendants because they relate to tax liability.[13]

The defendants contend that business cards and their checkbook[14] were not within the scope of the search warrant. They argue that the business cards contain only contact information, not financial information. They maintain that the IRS already had the information contained in the checkbook from their bank and object to the seizure of blank checks as outside the scope of the warrant. The government asserts that the business cards are business financial information because they show that the defendants were running their own home businesses and generating income. It maintains that the checkbook was properly seized as the defendants' personal financial record. Agent Groves testified that he seized business cards for the defendants' two home businesses. The Court agrees with the government that the business cards from the defendants' home businesses were properly seized as evidence of the existence of those businesses. Additionally, the seizure of the defendants' checkbook was proper as a personal financial record. The fact that the government could also obtain information on the defendants' checking account from a bank does not mean that it had access to the same information

---

[13]The defendants also object to the seizure of correspondence with the IRS contained in a folder labeled "Income Tax," item number twenty in Agent Groves' testimony and thirty-two in Exhibit C [Doc. 92], because such correspondence was already in the possession of the IRS. The Court likewise finds that this correspondence was properly seized as the defendants' personal financial records. At the January 22 suppression hearing, the defendants stated that they did not object to the seizure of the tax forms contained in this folder pursuant to the search warrant. They did object to the seizure of notes contained within this folder that were seized under the plain view doctrine, which will be discussed in the next section.

[14]These items are numbers seventeen and eighteen in the summary of Agent Grove's testimony in this report and numbers twenty-four and twenty-eight in Exhibit C [Doc 92]. The Court notes that the government stated that Mr. Dirr's business cards, listed as item 27 in Exhibit C, had been returned to the defendants.

49

contained in the checkbook, which could contain the defendants' personal notations. Although it is difficult to infer what financial information could have been obtained from the blank checks, the search warrant expressly permits the seizure of "canceled and uncancelled checks." Court finds that the seizure of the entire checkbook was within the scope of the Tennessee search warrant.

The government asserts that agents properly seized a folder labeled "Social Security,"[15] containing an invoice on the purchase of silver, a copy of a 1998 form 1040, an employee pay stub, auto insurance, vehicle registration information in the name of the Lotus Group, and insurance information because these items are personal financial records. The defendants contend that the agent must have added papers to this folder because the papers described were not kept in this folder, that the folder contains information already in the possession of the IRS, and that the 1998 form 1040 falls outside the scope of the warrant, which authorizes the seizure of financial records from 1999 through the present. Agent Groves testified that the folder is as it was at the time of the search because he would not place loose papers into a folder. He stated that the 1998 tax return would have been filed in April 1999, thus, he believed that the 1998 form 1040 was a personal financial record within the time frame given in the search warrant.

The Court finds generally that this folder and most of its contents were properly seized as the defendants' personal financial records. The only evidence before the Court is that the folder is in the same condition as when it was seized. With regard to the 1998 form 1040, the

---

[15]This folder is item number nineteen in the summary of Agent Grove's testimony in this report and item number thirty in Exhibit C [Doc 92].

50

search warrant only authorizes the seizure of financial records, including federal income tax returns, "from 1999 through the present[.]"  The 1998 form 1040 falls outside the scope of that time frame and, thus, was not properly seized under the search warrant.  On the other hand, the Court finds that the 1998 form 1040 was properly seized under the plain view doctrine, which is discussed at length in the next section, because the 1998 form's nexus to the allegations of tax evasion were immediately apparent to the seizing agent, who knew that the 1998 return was filed in 1999.

The defendants challenge the seizure of a blank IRS 1040 instruction booklet[16] for tax year 2000, contending that this booklet was not a personal financial record and was already in the IRS's possession.  The government argues that this booklet is a personal financial record of the defendants.  Agent Groves testified that the booklet contained no handwriting or calculations and that none of the worksheets contained therein had been filled out.  Nevertheless, he stated that the booklet was relevant to show the defendants' willfulness and knowledge.  The Court finds that a blank IRS 1040 instruction booklet is not a personal financial record of the defendants.  Under the business financial records category, the search warrant lists "federal income tax forms and work papers," but the Court also cannot find that a blank instruction booklet qualifies as a work paper.  Accordingly, this instruction booklet was improperly seized under the search warrant.  Nevertheless, the Court finds that it was properly seized under the plain view doctrine, which is fully discussed in the next section, because its nexus to the allegations of tax evasion was immediately apparent.

_____

[16]This instruction booklet is item number twenty-two in the summary of Agent Grove's testimony in this report and item number thirty-five in Exhibit C of the United States' Notice of Compliance With Order Regarding Seized Items [Doc 92].

The defendants contend that the agents improperly seized a folder labeled "HTS New Info (1/01),"[17] containing a worksheet for IRS form W-4, a W-2 employee exemption, and a "notice of affidavit statement and rebuttal to Internal Revenue Code Section 6011" that Mr. Dirr filed with the IRS. The defendants also object to the seizure of a folder labeled "Sales Tools,"[18] containing a Denzo pay stub and a blank 2000 W-4 form. They assert that these documents were already in the possession of the IRS and that the seizure of these items allowed the agents to "get into the mind[s]" of the defendants, which was improper under the search warrant. The government argues that these documents were properly seized as the defendants' personal financial documents. Agent Groves testified that the HTS folder contained a 2001 tax statement that had been filed with the IRS and that the Sales Tools folder contained a Denzo pay stub. The Court finds that these are personal financial documents, the seizure of which were within the scope of the Tennessee search warrant, notwithstanding the fact that the IRS may have had these documents or the government might have obtained them from another source. Agent Groves also testified that the Sales Tools folder contained a blank 2000 W-4 form. The Court finds that this document was improperly seized under the search warrant for the same reason as the 1040 instruction booklet discussed above. Nevertheless, the Court finds that the agent could seize this

---

[17]This folder is item number twenty-three in the summary of Agent Grove's testimony in this report and item number thirty-eight in Exhibit C [Doc 92]. The defendants also object to the seizure of materials relating to the filing of false UCC-1 financing statements and other documents with the IRS under the plain view doctrine. That contention will be analyzed in the next section.

[18]This folder is item number twenty-five in the summary of Agent Grove's testimony in this report and item number forty in Exhibit C [Doc 92]. The defendants challenge the seizure of another item in this folder–a handwritten notation that the defendants' home business Living in Paradise "goes sovereign"–under the plain view doctrine, which will be discussed in the next section.

form pursuant to the plain view doctrine, as will be discussed in the next section, because like the blank 1040 instruction booklet, its nexus to the criminal allegations was immediately apparent.

The defendants object to the seizure of the following electronic storage media that were seized from Mr. Dirr's hotel room pursuant to the South Carolina search warrant: A floppy disc with HTS label,[19] a floppy disc with blank label,[20] a floppy disc labeled "SCU-0110,"[21] a floppy disc labeled "HTS–The Ultimate Identity Redemption,"[22] an unlabeled CD-RW containing files related to defendants' tax avoidance,[23] an unlabeled DVD-RW containing files related to defendants' tax avoidance,[24] and a CD labeled "Tax Answers the IRS Doesn't Want You to Know."[25] The defendants argue that none of these items contain their personal financial information but that some of them contain information or documents already in the possession of the IRS. The government argues that all of these items were properly seized as "information

---

[19]This floppy disc is item number twenty-seven in the summary of Agent Grove's testimony in this report and item number forty-two in Exhibit C [Doc 92].

[20] This floppy disc is discussed in item number twenty-eight in the summary of Agent Grove's testimony in this report and item number forty-four in Exhibit C [Doc 92].

[21] This floppy disc is discussed in item number twenty-eight in the summary of Agent Grove's testimony in this report and item number forty-five in Exhibit C [Doc 92].

[22]This floppy disc is discussed in item number twenty-eight in the summary of Agent Grove's testimony in this report and item number forty-six in Exhibit C [Doc 92].

[23]This floppy disc is discussed in item number twenty-eight in the summary of Agent Grove's testimony in this report and item number forty-seven in Exhibit C [Doc 92].

[24]This floppy disc is discussed in item number twenty-eight in the summary of Agent Grove's testimony in this report and item number forty-eight in Exhibit C [Doc 92].

[25]This floppy disc is discussed in item number twenty-eight in the summary of Agent Grove's testimony in this report and item number forty-nine in Exhibit C [Doc 92].

and/or data stored in the form of magnetic or electronic coding on computer media . . . which contain financial information relating to Brett Dirr, Renee Dirr, or the Lotus Group."

After reviewing Agent Groves' testimony, the Court finds that the following four items were properly seized as stored data containing the defendants' financial information: (1) Floppy disc with blank label containing a response letter to the IRS, (2) floppy disc labeled "SCU-0110 (SCU-011AWRITEST.)" containing completed go-by for Notice of Default to IRS, (3) unlabeled CD-RW containing affidavits, a quit claim deed to the Lotus Group, a completed 2001 tax statement, and information on the defendants payment of $4,000 to Global Prosperity and HTS, and (4) an unlabeled DVD containing the national free-citizen affidavits filed by the defendants and a document addressed to the IRS rescinding all prior tax statements. Although the remaining three items–the floppy disc labeled HTS, the floppy disc labeled "HTS–The Ulitmate Identity Redemption," and a CD labeled "Tax Answers the IRS Doesn't Want You to Know"–contain information relating to tax avoidance, they do not contain any information personal to the defendants. The Court has no information that the go-bys contained on these discs were completed. Accordingly, these three items were not within the scope of the South Carolina search warrant. On the other hand, the Court finds that these items were properly seized under the plain view doctrine, which will be discussed in the next section, because the seizing agent had probable cause to connect these items with the alleged criminal activity.

The defendants also challenge the seizure of four non-electronic items under the South Carolina search warrant: Volumes one and two of the Organic Sovereign American

54

Freeman Compendium,[26] an unlabeled folder containing business cards and correspondence with David Miner,[27] and a folder labeled "Tax Answers Workbook,"[28] containing correspondence between the defendants, David Miner, and Ray W. and materials discussing tax avoidance. The defendants contend that these items do not contain their financial records and that they should not have been seized as "anti-government rhetoric" because this category was overly broad. The government argues that the two volumes of the Freeman Compendium were properly seized as "written or printed material which contains . . . anti-government rhetoric." It maintains that the two folders were properly seized as "written or printed material which contains financial information relating to Brett Dirr, Renee Dirr, or the Lotus Group and/or anti-government rhetoric."

As discussed fully in the particularity section above, the Court has already found that the "anti-government rhetoric" language in Attachment B to the South Carolina search warrant should be stricken for being overly broad. The Court finds that the two volumes of the Freeman Compendium do not come within any other categories of items permitted to be seized under the South Carolina search warrant. Accordingly, these two books were not within the scope of the warrant, and the Court finds that these two books should be suppressed.[29] With

---

[26]These books are number fifty on Exhibit C [Doc. 92], but Agent Groves provided no additional testimony about them.

[27]This folder is item number 51 on Exhibit C [Doc. 92], but Agent Groves provided no additional testimony on this item.

[28]This folder is item number 52 on Exhibit C [Doc. 92], but Agent Groves provided no additional testimony on this item.

[29]The Court finds that the lack of information about these books and whether Agent Groves immediately recognized them as promoting methods of tax evasion prevent the Court from finding they were properly seized under the plain view doctrine.

55

regard to the two file folders, each containing correspondence with David Miner, Agent Groves did not provide any specific testimony on these folders, which were raised at the very end of the lengthy suppression hearing. Agent Groves did testify that David Miner was a known local tax protester who wrote "Tax Answers the IRS Doesn't Want You to Have" and whom Groves investigated at the same time that he was investigating the defendants. Groves stated that Miner was affiliated with the We the People Foundation, which Groves characterized as a "notorious tax scam." Groves also testified that Miner advocated using portions of the individual master file (IMF) to sue IRS agents in order to get the agents to reverse the codes on the IMF. Based upon this testimony, the Court finds that the file folder labeled "Tax Answers Workbook" was properly seized as containing the defendants' financial information because it contained correspondence between the defendants and David Miner and materials discussing what the government characterizes as "illegal tax evasion tactics." The Court finds that the link between the folder's label and Miner's tax writings support an inference that the correspondence contained within this folder related to income taxes. The unlabeled file folder can support no similar inference. The Court finds that without more information as to the contents of the correspondence contained in the unlabeled file folder, it cannot find that the unlabeled folder was properly seized as financial information. Accordingly, the unlabeled file folder should also be suppressed.[30]

       In summation, the Court finds that the 1998 form 1040, the blank 1040 instruction booklet, the blank W-4 form, the floppy disc labeled HTS, the floppy disc labeled HTS-The

---

[30]The Court similarly finds that the lack of information about the contents of the file folder prevent its seizure under the plain view doctrine.

Ultimate Identity Redemption, and a CD labeled "Tax Answers the IRS Doesn't Want You to Know" were not within the scope of the search warrants but should not be suppressed because they fall within an exception to the warrant requirement–the plain view doctrine. The Court finds that the two volumes of the <u>Organic Sovereign American Freeman Compendium</u> and the unlabeled folder containing business cards and correspondence with David Miner, which were seized from Mr. Dirr's South Carolina hotel room, should be suppressed because they do not fall within the scope of the search warrant.

*(ii) Plain View Doctrine*

The government argues that eighteen of the retained items[31] were properly seized pursuant to the plain view doctrine. The defendants contend that the items in question could not have been seized under the plain view doctrine because the items were not themselves contraband but, instead, are alleged to be evidence of the crimes under investigation. They also maintain that the items could not be seized pursuant to plain view because the agents had to read the documents and the books to know their relevance to the case, thus the criminal nature of the items was not immediately apparent.

In order for evidence to fall within the plain view exception to the warrant requirement, the evidence in question must be "(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the

---

[31]These are items 1, 3, 6 through 12, portions of 13 and 18, 22, portions of 32, 34, portions of 38, 39, portions of 40, and 41 in Exhibit C of the United States' Notice of Compliance With Order Regarding Seized Items [Doc 92]. The Court will also consider whether eight items that it found were improperly seized under the search warrants were properly seized pursuant to the plain view doctrine.

object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself." United States v. Roark, 36 F.3d 14, 18 (6th Cir. 1994) (citing Horton v. California, 496 U.S. 128, 136-37 (1990)); see also United States v. Bishop, 338 F.3d 623, 626 (6th Cir. 2003), cert. denied, 540 U.S. 1206 (2004); United States v. Bradshaw, 102 F.3d 204, 211 (6th Cir. 1996). In the present case, the agents were lawfully in the defendants' residence and in Mr. Dirr's hotel room executing search warrants. The application of the plain view doctrine in this case turns upon whether items that have to be read and/or opened to determine their incriminating nature are in plain view or immediately incriminating.

The Sixth Circuit has held that determining whether an item is immediately incriminating "does not demand an 'unduly high degree of certainty;' rather, a plain view seizure is 'presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'" United States v. Calloway, 116 F.3d 1129, 1133 (6th Cir.) (quoting Texas v. Brown, 460 U.S. 730, 741-42 (1983) & Payton v. New York, 445 U.S. 573, 587 (1980) (emphasis omitted)), cert. denied 522 U.S. 925 (1997). The following factors, none being alone determinative, guide the assessment of whether the incriminating character of an item was immediately apparent:

> (1) the nexus between the seized object and the items particularized in the warrant; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to associate it with criminal activity; and (3) whether probable cause is the direct result of the executing officer's instantaneous sensory perceptions.

Id. (citing United States v. Beal, 810 F.2d 574, 576-77 (6th Cir. 1987)).

The defendants first contend that only items that are contraband or otherwise illegal to possess can be seized pursuant to the plain view doctrine. They maintain that only then

58

is the criminal character of the item immediately apparent. The Court finds that the factors listed above that guide the determination of whether the incriminating nature of an item was immediately apparent for seizure under the plain view doctrine belie this argument. An item does not have to be itself contraband for its nexus to the items particularized in the search warrant to reveal its incriminating character. Moreover, the Sixth Circuit has upheld the seizure of items not themselves illegal under the plain view doctrine. See, e.g., United States v. Garcia, 496 F.3d 495, 512 (6th Cir. 2007) (approving the seizure of "zigzag papers, scales, and green plastic shrink wrap" under the plain view doctrine, when the search warrant only authorized the seizure of cocaine); Calloway, 116 F.3d at 1133 (upholding the seizure of a note listing weapons, two bank receipts, the defendant's will, and a power of attorney under the plain view doctrine); see also United States v. Bruce, 396 F.3d 697, 711 (6th Cir.) (observing that officers searching for drugs and papers showing ownership of drugs under a search warrant could have seized, under the plain view doctrine, various driver's licenses and credit cards bearing names of persons other than those to whom the room was registered), vacated in part on other grounds upon rehearing, 405 F.3d 1034 (6th Cir. 2005) (remanding for resentencing).

The defendants rely upon United States v. Garcia, 496 F.3d 495 (6th Cir. 2007), to argue that if an item has to be read prior to its incriminating nature being apparent, then the plain view doctrine is inapplicable. In Garcia, officers executing a search warrant that only authorized the seizure of cocaine, seized over one hundred documents and drug paraphernalia. Id. at 510. The officers claimed to have seized the non-drug items under the plain view doctrine. The issue addressed by the court was "whether a document, even though in plain view, is within the plain view exception if it must be read in order for its incriminating nature to be determined.

59

We hold that it is not." Id. The executing officer in Garcia admitted that although he needed to search through the papers to make sure small packets of cocaine were not hidden among them, he did not have to read the documents to search for cocaine. Id. Applying the factors set out above to determine whether the incriminating nature of the documents was immediately apparent, the court held that

> [n]either the intrinsic nature nor the appearance of most of the documents gave the officers probable cause to believe that they were associated with criminal activity. Further, the officers did not, as a result of their "instantaneous sensory perception," recognize the incriminating nature of most of those documents. Receipts, financial records, and invoices, in and of themselves, are lawful and innocuous items, and the testimony of [the executing officers] made it clear that in order to establish an association between these documents and any criminal activity, they had to undertake "further investigation." [One agent] expressly admitted that he read and reviewed every document that he thought might assist in Garcia's prosecution. These documents therefore did not come within the scope of the plain view exception to the warrant requirement.

Id. at 511. The present defendants likewise argue that the books, folders, and other articles seized by the agents in the instant searches were not illegal to possess and had to be examined and read by the agents for their relevance to the allegations to become apparent. The defendants contend that the need to conduct any "further investigation" of the items seized means that the incriminating nature could not have been immediately apparent. See Shamaeizadeh v. Cunigan, 338 F.3d 535, 554 (6th Cir. 2003) (holding seizure of documents, records, and jewelry improper under plain view doctrine because "further investigation" was needed to determine relationship between these items and the illegal drugs and drug paraphernalia particularized in the search warrant). Thus, the defendants contend that the items seized outside of the search warrants in this case could not have been seized under the plain view doctrine.

60

The government argues that <u>Garcia</u> is inapplicable to the present case because in

<u>Garcia</u>, the search warrant did not authorize the officers to search for documents, only cocaine.

<u>See</u> <u>Garcia</u>, 496 F.3d at 510. Similarly, in <u>Shamaeizadeh</u>, the search warrant permitted seizure

of illegal drugs, illegally possessed prescription drugs, and drug paraphernalia. <u>See</u>

<u>Shamaeizadeh</u>, 338 F.3d at 554. In the present search, the agents were searching for financial

documents, which required them to review the papers or the electronic data they encountered in

the defendants' home and Mr. Dirrs' hotel room to determine whether these items came within

the scope of the search warrant. The government argues this case is analogous to <u>United States</u>

<u>v. Calloway</u>, in which officers searching for certain documents pursuant to a search warrant

seized other documents not listed in the warrant under the plain view doctrine. 116 F.3d at 1133.

The search warrant in <u>Calloway</u> permitted officers to search for "'[d]ocuments listing names of

Federal Express crew members, notes concerning Federal Express Flight 705, [and] records

pertaining to insurance beneficiary transfers.'" <u>Id.</u> In the course of the search, officers seized

other documents not listed in the search warrant: "(1) a note listing weapons; (2) two bank

receipts; (3) Mr. Calloway's will; and (4) a power of attorney." Finding the seizure of these

other documents justified under the plain view doctrine, the court reasoned that

> In this case the agents were executing a valid search warrant that
> required them to seize certain documentary evidence. Unless they
> were to seize every scrap of paper in the apartment, the agents had
> to examine such documents as they came across–and the seized
> documents were obviously in plain view of the agents responsible
> for examining them.

<u>Id.</u> Moreover, the court found the incriminating nature of the seized documents was immediately

apparent to the officers who knew the type of weapons the defendant had used in the crime and

who suspected the defendant had conducted suspicious financial arrangements after he changed

61

his insurance beneficiaries shortly before the crime.  Id.

The government argues that like in Calloway, the agents in this case went to the defendants' house and Mr. Dirr's hotel room with the authorization to seize documentary evidence in the form of personal and business financial records.  The government notes that some of these documents could be easily identified, such as tax forms, but others, such as "documents showing the acquisition, secretion, transfer, and/or concealment of assets," required a more careful examination.  The government asserts that in determining whether the documents they encountered came within the scope of the search warrants, the agents had to read those documents, which in turn brought the incriminating nature of the documents seized under the plain view doctrine into plain view.

The defendants argue that Calloway is distinguishable from the present case because in Calloway, the documents seized under the plain view doctrine were similar to those sought under the search warrant.  The Court agrees with the government that this case more closely resembles Calloway than Garcia or Shamaeizadeh, because the instant search warrants authorize the search for documents, whereas the search warrants in Garcia and Shamaeizadeh authorized only the search for drugs and, in the case of Shamaeizadeh, drugs and drug paraphernalia.  Moreover, the Court does not find that Garcia overruled Calloway, as suggested by the defendants.  See Blake v. County of Livingston, No. 06-1850, 2007 WL 4322588, at *5 (6th Cir. Dec. 11, 2007) (post-Garcia case, citing to Calloway for its finding that "documents were in plain view and their incriminating nature was readily apparent").  Accordingly, the Court finds that under the circumstances of this case, the fact that the agents' examined and reviewed the seized documentary evidence or electronic storage items does not remove those items from

62

plain view.

The fact that the agents were permitted to examine and review documents to determine whether they could be seized under the search warrant is not the end of the plain view inquiry. The agents still had to be able to recognize a nexus between the document or file seized and the items listed in the warrant and/or gain probable cause for the seizure of the item directly from the agents' "instantaneous sensory perceptions."[32] See Calloway, 116 F.3d at 1133. The government contends that IRS agents searching for personal and business financial records could immediately understand the incriminating nature of the documents and items that found in the course of the searches because those items demonstrated the defendants' participation in a scheme to evade taxes or confirmed the defendants' knowledge of their tax responsibilities. The defendants argue that the items allegedly seized under the plain view doctrine have no nexus to the financial records listed in the search warrants. The Court will review each of the items alleged to have been seized under the plain view doctrine to determine whether they were of an immediately incriminating character upon their initial examination and review by the agent.

The government contends that Agent Groves properly seized a binder entitled The Global Prosperity 2001 Foundational Education Course,[33] containing cassette tapes, under the plain view doctrine. It maintains that the defendants' possession of this binder shows their participation in an illegal tax avoidance scheme and relates to the issue of their willfulness. Groves testified that he had received training in various tax-avoidance schemes and that Global

---

[32]The Court notes that the third factor, "whether the intrinsic nature or appearance of the seized object gives probable cause to associate it with criminal activity," is generally not applicable to the items seized pursuant to plain view in this case.

[33]This is item number one both in Groves' testimony and in Exhibit C [Doc. 92].

63

Prosperity is a "well-known tax scam" involving concealing assets and income. He stated that Global Prosperity sold a package of twelve tapes with instruction on how to commit income tax evasion. He also knew from his investigation of the case that the defendants had formed the Lotus Group to conceal assets. Groves testified that upon seeing the Global Prosperity binder, it was immediately apparent to him that it was evidence of the crimes he was investigating, particularly the element of willfulness.

The Court finds that based upon Agent Groves testimony, a nexus exists between the items sought under the search warrant–specifically financial documents showing the concealing of assets–and the Global Prosperity binder, which contains instructions on how to conceal assets for the purpose of tax evasion. Moreover, the Court finds that Groves had probable cause to associate the binder with the alleged criminal activity directly upon his "instantaneous sensory perception" of seeing the title on the binder. Accordingly, the Court finds that the Global Prosperity binder was properly seized under the plain view doctrine.

The government contends that Agent Groves properly seized a tabbed copy of the Internal Revenue Code[34] from the defendants' home under the plain view doctrine. Groves testified that he seized a copy of the Internal Revenue Code from the defendants' basement bookshelf and after he removed it from the bookshelf, he noticed that it had been tabbed and highlighted. He said he decided to seize the Code immediately upon spotting it in the bookshelf and that he believed it showed the defendants' knowledge and understanding of the tax code. He testified that based upon his investigation, he knew that the defendants had filed multiple

---

[34]This is item number two in Groves' testimony and item number three in Exhibit C [Doc. 92].

64

documents with the IRS that misrepresented income and the term "person" under the Code. The Court finds that Groves had probable cause to believe the Code would be relevant to the crimes alleged in the search warrant as soon as he saw it, based upon his knowledge of the defendants' prior filings with the IRS. Thus, the Internal Revenue Code was properly seized under the plain view doctrine in this case.

The government next claims that Agent Groves properly seized a book entitled Redemption in Law: Theory and Practice–"Cracking the Code" under the plain view doctrine because the defendants' possession of this book evidences their willfulness and research on the use of frivolous UCC filings for the purpose of tax evasion. Groves testified that upon seeing this book on a basement bookshelf in the defendant's home, it was immediately apparent to him that the book was evidence in this case because "Cracking the Code" refers to the Uniform Commercial Code and the book espouses making sham filings to shield assets. Although he was not familiar with this book in particular, he stated that he was familiar with the use of false UCC filings by tax resisters and that Mr. Dirr had previously made such false UCC filings. The Court finds that a nexus exists between this book and the financial documents relating to the concealment of assets particularized in the search warrant. Moreover, Groves had probable cause to believe the book constituted evidence of the defendants' willfulness with regard to the alleged tax crimes based upon his instantaneous sensory perception of seeing the book. Accordingly, the Court finds that Redemption in Law: Theory and Practice–"Cracking the Code" was properly seized under the plain view doctrine.

The government contends that Agent Groves properly seized under the plain view

doctrine an unlabeled folder[35] containing printed tax-resister materials from Robert Schulz and David Miner of the We the People Foundation. It argues that the defendants' possession of these materials shows their willfulness and research with regard to tax evasion schemes. Groves testified that he found this manilla folder containing two documents on the defendants' basement bookshelf. One document was "Tax Answers the IRS Doesn't Want You to Have" written by David Miner, whom Groves characterized as a known local tax protestor and whom Groves was investigating at the same time as the defendants, and the other document was "Illegal Authority of Income Tax." Groves stated that he was also aware of Robert Schulz and that the We the People Foundation is a "notorious tax scam." Groves said at the time of the search, he opened the folder and read the title of the document and the author's name, but he did not read the documents themselves until later. He testified that as soon as he opened the folder, it was immediately apparent to him that it contained evidence in this case based upon his knowledge of David Miner. The Court finds that directly upon his viewing the contents of the folder, including the names of the individuals authoring the documents enclosed, Groves had probable cause to believe that the contents of the folder was related to the tax crimes under investigation. The folder and its contents were properly seized under the plain view doctrine.

       The government maintains that Agent Groves properly seized two black binders[36] entitled <u>Liberty Redemption Pack</u> and <u>Liberty Action Pack</u>, both by Dana Ewell, under the plain view doctrine because the defendants' possession of these items evidenced their willfulness and

---

[35]This folder is item number five in Groves' testimony and item number seven in Exhibit C [Doc. 92].

[36]These binders are item number six in Groves testimony and items eight and nine in Exhibit C [Doc. 92].

purchase of materials promoting tax evasion. Groves testified that these binders were tax protestor guides by Dana Ewell and that they contained "go-by's" for much of what the defendants had filed with the IRS, including sham UCC filings. He said that he was aware of Dana Ewell, whom he said runs the Liberty Action "tax scam." He said that the defendants had put the contents of these binders into action. The Court finds that a nexus exists between these binders and the financial records particularized in the search warrant, specifically financial documents relating to the concealment of assets. Additionally, Groves had probable cause to believe that the contents of these binders were relevant to the tax crimes alleged as soon as he saw the binders, which he knew were linked with Dana Ewell, and the "go-by's" contained therein. These binders were properly seized under the plain view doctrine.

The government next argues that Agent Groves properly seized an internet printout[37] of an article dated September 16, 2003, and entitled "IRS and States Announce Partnership to Target Abusive Tax Avoidance Transactions" under the plain view doctrine. Groves testified that this article was seized from the defendants' basement, although he was not sure of the exact location in the basement. He believed that the article showed that the defendants had been researching abusive tax schemes and, therefore, the article was evidence of their knowledge. He said he was not familiar with the contents of the article at the time the search warrant was executed and that he did not read it at the defendants' home. The Court finds that this article was not properly seized under the plain view doctrine. Although the Court can infer a nexus between the contents of this article and the tax crimes forming the basis for the

---

[37]This article is item number seven in Groves' testimony and item number ten in Exhibit C [Doc. 92].

search, especially in light of the information in the affidavit regarding the defendants' concealment of assets, Agent Groves did not realize that nexus at the time he seized the article because he was not familiar with the article's contents. Moreover, the Court questions whether the title of this article alone was sufficient to give Groves probable cause to believe it was linked to the crimes alleged. Accordingly, Court finds the evidence from the suppression hearing insufficient to show that this article could be seized under the plain view doctrine.

The government contends that Agent Groves properly seized excerpts from "Master File Decoder"[38] by Christopher M. Hansen under the plain view doctrine. Groves testified that on the defendants' bookshelf, he found a printout of an internet article by Christopher M. Hanson explaining how to decode one's individual master file (IMF) and stating that the "z" code indicated a criminal investigation. Groves said he was aware of a "scam" that involved deciphering ones IMF in order to intimidate IRS officer to discontinue an investigation. He said David Miner advocated using portions of the IMF to sue IRS agents in order to get the agents to reverse codes in the IMF. Groves believed that the defendants' possession of this article showed that they knew how to read the IMF. The Court finds that this article was not properly seized under the plain view doctrine. Even if the defendants' possession of the article reveals that they know how to interpret their IMF, the Court can discern no nexus between that ability or the article itself to the items requested under the search warrant. Moreover, the Court finds that the fact that certain tax schemes promote using ones knowledge of the IMF to intimidate IRS employees does not provide probable cause to link the defendants' possession of an article on how to interpret the IMF (as opposed to an article on how to use ones knowledge of

---

[38]This is item number eight in Groves' testimony and item eleven in Exhibit C [Doc. 92].

the IMF to evade taxes) to the tax crimes alleged in the search warrant. Accordingly, the Court finds that this article should be suppressed.

The government contends that Agent Groves properly seized the contents of a box labeled "Bill B.'s Pkg. Part 4 16"[39] under the plain view doctrine because the possession of these materials show the defendants' willful participation in a tax evasion scheme. It argues that the contents of this box make up the defendants' "Reliance Defense Package," which the defendants assembled and maintained as a "reliance" or "willfulness" defense in the event that the IRS proceeded against them for tax evasion. Agent Groves testified that another agent found and then led him to a box labeled "Bill B.'s Package" in the defendants' basement crawl space. Groves said he was familiar with Bill Benson, who wrote The Law That Never Was and sold the Reliance Defense Package, the purpose of which was to provide a defense to willfulness and knowledge if the IRS investigated the purchaser for tax evasion. In addition to the items sold by Benson, the box in the crawl space contained correspondence between Benson and the defendants and a receipt of purchase. Groves stated that he seized the box as it was and did not look through it at the defendants' residence.

The Court finds that Groves instantly recognized the box and its importance to the investigation upon seeing it in the crawl space. Based upon his knowledge of the Reliance Defense Package and its purpose of defending against a prosecution for tax evasion, Groves had probable cause to believe that the box in the defendants' house was evidence of the crimes under investigation. Moreover, the Court finds a nexus between the box and the items particularized in

_____

[39]This box is item number nine in Groves' testimony and item twelve in Exhibit C [Doc. 92].

the search warrant, specifically the defendants' personal and business financial records relating to the payment of income taxes. Accordingly, the Court finds that Groves properly seized the box labeled "Bill B.'s Package" under the plain view doctrine.

The government argues that Agent Groves properly seized handwritten notes and correspondence[40] contained in a file folder labeled "Strawmen/Woman Birth Certificates" under the plain view doctrine. It maintains that the handwritten notes discuss the defendants' involvement with HTS, an organization that promotes illegal tax evasion schemes and that the correspondence indicated the filing of false UCC-1 financing statements. Groves testified that in addition to the fraudulent UCC statements which were seized pursuant to the search warrant, the folder contained the defendants' handwritten notes and correspondence regarding Bill Benson and HTS, an organization used by the defendants that provided "go-by's" for certain documents. The Court finds that although the testimony on the handwritten notes and correspondence was scant, Agent Groves was able to recognize immediately the connection between Bill Benson, HTS, and the items particularized in the search warrant, namely the financial documents relating to concealment of assets and the payment of income tax. The Court finds that these notes and correspondence were properly seized under the plain view doctrine.

The government next asserts that Agent Groves' seizure of portions of a file folder[41] labeled "Dana-IRS Stuff" was appropriate under the plain view doctrine. The government argues that in addition to papers relating to placing assets into trusts, which were

_____

[40]The folder containing these notes is item number ten in Groves' testimony and number thirteen in Exhibit C [Doc. 92].

[41]This folder is item number thirteen in Groves' testimony and eighteen in Exhibit C [Doc. 92].

seized under the search warrant, the folder contained correspondence and notes reflecting the defendants' research of tax evasion schemes and preparation of documents directly associated with tax avoidance.  It maintains that these materials are evidence of the defendants' willfulness with respect to their tax evasion tactics.  Groves testified that this folder, which was seized in the basement, contained correspondence with Dana Ewell (the author of the <u>Liberty Redemption Pack</u> discussed above) about the Lotus Group.  It also contained documents relating to placing assets in trusts and handwritten notes regarding signing documents with a full reservation of rights.  Groves stated that the defendants had signed their responses to letters from the IRS in this way.  Groves had already testified that he was aware of  Dana Ewell, whom he said runs the Liberty Action "tax scam."  The Court finds that a nexus exists between the notes and correspondence in this folder and the financial records particularized in the search warrant, specifically financial documents relating to the concealment of assets.  Additionally, as soon as he reviewed the contents of the folder and saw the correspondence with Ewell, Groves had probable cause to believe that the contents of this folder were relevant to the tax crimes alleged. The contents of this folder, which did not come within the search warrant, were  properly seized under the plain view doctrine.

The government argues that Agent Groves properly seized the Internal Revenue Service transaction codes pocket guide[42] under the plain view doctrine.  It maintains that the defendants' possession of this booklet indicates their knowledge and willfulness regarding participation in tax evasion schemes.  Groves testified that he found an IRS code pocket guide in

_____

[42]This booklet is item number sixteen in Groves' testimony and twenty-two in Exhibit C [Doc. 92].

the area of the desk and bookshelves in the defendants' basement.  He stated that the guide contained information on computing taxes and decoding the IMF.  He believed that the defendants' possession of this booklet, which is a public document published by the IRS, was evidence of the defendants' knowledge of taxes and the IRS.  Similar to the <u>Internal Revenue</u> <u>Code</u> discussed above, the Court finds that Groves had probable cause to believe the pocket guide would be relevant to the crimes alleged in the search warrant as soon as he saw it based upon his knowledge of the defendants' prior filings with the IRS, which were set out in the affidavit to the search warrant.  Thus, the IRS transaction pocket guide was properly seized under the plain view doctrine in this case.

      The government contends that pursuant to the plain view doctrine, Agent Groves properly seized Mr. Dirr's correspondence with the IRS from 2000 and 2001 and correspondence and notes regarding defendants' discussion of tax evasion tactics, all contained in a file folder labeled "Income Tax."[43]  The government alleges that these materials were evidence of the defendants' willfulness and participation in an illegal tax avoidance scheme.  At the hearing, the defendants stated that they had no objection to the tax forms that were also contained in this folder.  Instead, they objected only to the seizure of the correspondence with the IRS because the IRS already possessed this correspondence.  Agent Groves was not questioned by either party about the contents of this folder.  As discussed above in the context of items seized under the search warrant, the Court finds the fact that a government agency possessed a copy of the document in question does not factor into the plain view analysis.  In the present case, the

_____

[43]This folder is item number twenty in Groves' testimony and thirty-two in Exhibit C [Doc. 92].

affidavit in support of the search warrant reveals that Groves had already reviewed the defendants' correspondence with the IRS in his investigation of the defendants. Accordingly, the Court finds that Groves would have immediately recognized this correspondence and its relevance to this case. Moreover, a brief review of the enclosed notes on tax evasion tactics would have given Groves probable cause to associate the notes with the criminal activity alleged in the search warrant. Accordingly, despite the lack of detailed testimony on the specific contents of this folder, the Court is able to find that its contents, to the extent that they do not come within the scope of the search warrant, were properly seized pursuant to the plain view doctrine.

The government contends that Agent Groves properly seized handwritten notes[44] on tax evasion under the plain view doctrine. It asserts that these notes, dated September 13, 2004, and relating to a conference with David Miner on tax evasion topics, show the defendants' willfulness and research of illegal tax evasion schemes. Groves testified that he seized handwritten notes dated September 13, 2004, from a file cabinet in the defendants' basement. These notes related to a conversation with David Miner about decoding the IMF. Groves stated that it was readily apparent to him that the notes related to the defendants' knowledge and willfulness. Groves had already testified regarding his knowledge of David Miner as a tax resister and the fact that Miner advocated using information from the IMF to sue IRS agents in order to force them to change codes. Based upon his knowledge of Miner and his agenda, the Court finds that Groves had probable cause to associate the handwritten notes dated September

---

[44]These notes are item number twenty-one in Groves' testimony and thirty-four in Exhibit C [Doc. 92].

13, 2004, with the allegations of tax evasion lodged against the defendants. Accordingly, the Court finds the notes dated September 13, 2004, were properly seized under the plain view doctrine.

The government argues that pursuant to the plain view doctrine, Agent Groves properly seized portions of a folder labeled "HTS New Info (1/01),"[45] namely a receipt for the HTS package and documents related to fraudulent UCC filings. The government maintains that these items reveal the defendants' willfulness and participation in an illegal tax evasion scheme. Groves testified that the HTS folder was seized from the defendants' filing cabinet by another agent. Groves thumbed through the folder at the defendants' house and determined it could be seized pursuant to the plain view doctrine. He said that a 2001 tax statement, which purported to give the IRS notice of an affidavit by Mr. Dirr and which was seized pursuant to the search warrant, was on the top of the materials in the folder. Groves had already testified about the defendants' filing of fraudulent UCC materials. The Court finds that upon looking through the documents in the folder, Groves immediately recognized their nexus to items listed in the search warrant, particularly financial documents relating to the concealment of assets. The contents of the HTS folder were properly seized under the search warrant and the plain view doctrine.

The government maintains that Agent Groves properly seized a file folder labeled "Cong. John Duncan"[46] under the plain view doctrine. The government states that the contents of the folder, which were comprised of a <u>CRS Report for Congress: Frequently Asked Questions</u>

---

[45]This folder is item number twenty-three in Groves' testimony and thirty-eight in Exhibit C [Doc. 92].

[46]This folder is item number twenty-four in Groves' testimony and thirty-nine in Exhibit C [Doc. 92].

<u>Concerning the Federal Income Tax</u> and notes on a meeting with Congressman Duncan on August 22, 2002, reveal the defendants' knowledge of the legality of the federal income tax. It also maintains that the defendants' possession of this folder is relevant to their willfulness. Groves testified that he seized a manilla folder labeled "Cong. John Duncan," which contained a <u>CRS Report</u> discussing frequently asked questions about the federal income tax, an internet printout on a bill to eliminate federal taxes, a letter stating that the defendant were glad to have met the congressman, and handwritten notes of the Dirrs' questions along with a notation to contact the Kentucky branch of We the People. Groves stated that the defendants' possession of the <u>CRS Report</u>, which provided correct information on the tax laws, was relevant to the Dirrs' knowledge. Groves said he seized the handwritten notes due to the reference to We the People, which is an anti-tax foundation. He believed that the information in this folder was relevant to his investigation of the defendants for tax evasion.

The Court finds the "Cong. John Duncan" folder was improperly seized under the plain view doctrine. Although the defendants' research about the federal income tax at first blush seems relevant to the alleged criminal activity of income tax evasion, the contents of this folder, relating primarily to a meeting with the defendants' congressman, are much more attenuated regarding the defendants' knowledge than their tabbed and highlighted copy of the <u>Internal Revenue Code</u> and the IRS pocket guide. Despite the singled notation to the We the People foundation, the Court finds that the weak nexus between this folder, the items particularized in the search warrant, and the crimes alleged is insufficient to support a finding that the criminal nature of the contents of this folder was immediately apparent.

The government contends that Agent Groves properly seized portions of a folder

75

labeled "Sales Tools"[47] under the plain view doctrine. It asserts that a handwritten notation that the defendants' home business was tax-exempt reveals the defendants' willfulness in participating in an illegal tax evasion scheme. Groves testified that along with a Denzo pay stub and a blank 2000 W-4 form, the "Sales Tools" folder contained a document stating that the defendants' home business Living in Paradise goes sovereign. Groves believed that the notations relating to this statement revealed that the defendants were actively seeing tax-exempt status and recruiting others to do so. He believed this document constituted an admission by the defendants that they were evading taxes and that it was relevant to their willfulness. The Court finds that this portion of the "Sales Tools" folder was properly seized pursuant to the plain view doctrine. Agent Groves immediately recognized the nexus between the notations on sovereignty and items particularized in the search warrant, specifically business financial records relating to the payment of taxes. Moreover, upon reading through the notes, he gained probable cause that the notation regarding the sovereignty of the defendants' home business was associated with the alleged criminal activity.

The government alleges that Agent Groves properly seized a folder labeled "Wallace Institute"[48] under the plain view doctrine. It alleges that this folder contained internet research on a website maintained by Devvy Kidd, including arguments by Larry Becraft and references to false arguments by Irwin Schiff. It asserts that these materials indicate the defendants' knowledge, willfulness, and research of illegal tax evasion schemes. Groves

---

[47]This folder is item number twenty-five in Groves' testimony and number forty in Exhibit C [Doc. 92].

[48]This folder is item number twenty-six in Groves' testimony and forty-one in Exhibit C [Doc. 92].

testified that he found a manilla folder labeled "Wallace Institute," which contained internet printouts of research on Devvy Kidd's website. Groves stated that he was "mildly familiar" with Kidd, whom he characterized as a proponent of "tax scams." The folder also contained information from Larry Becraft, whom Groves knew to be a former attorney associated with Bill Benson and a proponent of various "tax schemes" in his own right. The folder contained a letter from Becraft explaining that the UCC "scam" involving writing ones name in all capital letters was ludicrous. The folder also contained information on the arguments of Irwin Schiff, an author whom Groves knew to advocate filing a tax return for zero income in order to recover all withheld income. Groves said he seized this research because it showed the defendants' knowledge as they had made false UCC filings. Groves admitted that he did not open the "Wallace Institute" folder or examine its contents at the defendants' home.

Based upon the testimony at the suppression hearing, the Court finds that the "Wallace Institute" folder was improperly seized pursuant to the plain view doctrine. Groves testified that he did not open the folder or read its contents at the time it was seized so the Court cannot consider Groves' testimony on the contents of the folder in determining whether its incriminating character was immediately apparent. Groves gave no testimony on whether he recognized the "Wallace Institute" to be associated with schemes for tax evasion. Accordingly, the Court is compelled to find that Groves instantaneous sensory perception of the folder did not give him probable cause to associate the folder with the alleged criminal activity. The Court finds that this folder should be suppressed.

The Court next turns to the eight items that it found were not properly seized under the search warrants and will determine whether Agent Groves could have properly seized

those items under the plain view doctrine.  A 1998 form 1040, a blank 1040 instruction booklet, and a blank W-4 form were seized from the defendants' home.  The Court finds that Agent Groves could properly seized these three items under the plain view because immediately upon seeing them, he had probable cause to associate them with the allegations of tax evasion.  The Court finds a nexus between these forms/instructions and the items listed in the search warrant, particularly the personal financial documents relating to income tax.   Although the defendants were alleged to have failed to file income tax returns beginning in 1999, Agent Groves testified that a 1998 tax return would have been filed in 1999.   Accordingly, the Court finds that the 1998 form 1040, the blank 1040 instruction booklet, and the blank W-4 form were properly seized pursuant to the plain view doctrine.

The Court previously held that a floppy disc labeled HTS, a floppy disc labeled HTS-The Ultimate Identity Redemption, and a CD labeled "Tax Answers the IRS Doesn't Want You to Know," all seized from Mr. Dirr's South Carolina hotel room, were not within the scope of the search warrants because they contained no information personal to the defendants.  During the January 22 suppression hearing, Agent Groves testified about the link between HTS and the filing of fraudulent UCC statements and stated that the defendants' had put the teachings of HTS into practice with their fraudulent UCC filings.  Groves also testified that David Miner, the author of  "Tax Answers the IRS Doesn't Want You to Know," was a local tax resister who advocated using the information in ones IMF to intimidate IRS agents.  The Court finds that upon seeing the floppy discs and CD, Agent Groves would have immediately had probable cause to link these items with the alledged criminal activity of tax evasion by the defendants.  The Court finds that the floppy disc labeled HTS, the floppy disc labeled HTS-The Ultimate Identity

Redemption, and the CD labeled "Tax Answers the IRS Doesn't Want You to Know" were properly seized under the plain view doctrine.

The Court cannot find that the plain view doctrine applies to the seizure of two volumes of the <u>Organic Sovereign American Freeman Compendium</u> seized from Mr. Dirrs' South Carolina hotel room. These books no longer come within the search warrant because the Court has determined that the "anti-government rhetoric" language should be stricken from the items particularized in Attachment B. Moreover, Agent Groves gave no testimony on these books, thus the Court has no information on whether Agent Groves immediately recognized them as promoting methods of tax evasion, whether he believed the defendants had employed the ideas promoted by the book in actions Groves links to tax evasion, etc. Accordingly, the Court finds that these two books should be suppressed.

Finally, the Court previously found that an unlabeled folder containing business cards and correspondence with David Miner, which were seized from Mr. Dirr's South Carolina hotel room, did not fall within the scope of the search warrant because the Court had no testimony regarding the contents of the folder and whether it contained financial information. Agent Groves did not provide any specific testimony on this folder, which was raised at the very end of the lengthy suppression hearing. Agent Groves did testify that David Miner was a known local tax protester who wrote "Tax Answers the IRS Doesn't Want You to Have" and whom Groves investigated at the same time that he was investigating the defendants. Groves stated that Miner was affiliated with the We the People Foundation, which Groves characterized as a "notorious tax scam." Groves also testified that Miner advocated using portions of the individual master file (IMF) to sue IRS agents in order to get the agents to reverse the codes on

79

the IMF. The Court has already found that the CD labeled "Tax Answers the IRS Doesn't Want You to Know" was properly seized under the plain view doctrine, given Agent Groves' knowledge of David Miner and his anti-tax agenda, but that CD clearly related to tax matters per its title. The unlabeled folder containing correspondence with David Miner and his business cards cannot be treated in the same way. This folder could contain correspondence with Miner relating to decoding the IMF, tax matters, and the We the People Foundation or it could be completely unrelated to the criminal activity alleged. Accordingly, the Court cannot find that Agent Groves could have seized this folder under the plain view doctrine, and it should be suppressed.

In summation, the Court finds the following four items were not properly seized under the plain view doctrine and should be suppressed: (1) a September 16, 2003 printout of an internet article entitled "IRS and States Announce Partnership to Target Abusive Tax Avoidance Transactions," (2) excerpts from the "Master File Decoder" by Christopher M. Hansen, (3) a folder labeled "Cong. John Duncan," and (4) a folder labeled "Wallace Institute." The Court also finds that (1) the the two volumes of the <u>Organic Sovereign American Freeman Compendium</u> and (2) the unlabeled folder containing business cards and correspondence with David Miner, which were not properly seized under the search warrant, could not be seized pursuant to the plain view doctrine either. The Court recommends that these items be suppressed.

### (iii) General Search

The defendants contend that the seizure of numerous items outside the scope of

80

the search warrants converted the searches into general searches and requires the suppression of all the evidence seized in the two searches. They argue that regardless of the fact that the government has now returned "most" of the items seized, those items and others still retained were seized unlawfully.

The Sixth Circuit has held that a "general search" is a term of art under the Fourth Amendment: "'A search pursuant to a valid warrant may devolve into an invalid general search if the officers 'flagrant[ly] disregard . . . the limitations of [the] search warrant.'" United States v. Garcia, 496 F.3d 495, 507 (6th Cir. 2007) (quoting United States v. Lambert, 771 F.2d 83, 93 (6th Cir.1985)). An officer's disregard of the search warrant may be considered "flagrant" *only* if he goes beyond the scope of the warrant in the places in which he or she searches, not in the items taken under the warrant. Id. Accordingly, the defendants' argument that the sheer volume of items that were improperly seized under the search warrants convert the searches into general searches is wrong. A search pursuant to a valid search warrant in which a particular item is improperly seized outside of the warrant's scope does not violate the defendant's privacy interest in the area searched but, instead, deprives him of his control over his property. Id. Such violation will result in the suppression of only the item improperly seized. Id. "Thus, where the officers unlawfully seize certain items but do not flagrantly disregard the limits of the warrant by unreasonably searching places not authorized in the warrant, the court must suppress the unlawfully seized items, but 'there is certainly no requirement that lawfully seized evidence be suppressed as well.'" Id. (quoting Waller v. Georgia, 467 U.S. 39, 43 n.3 (1984)).

In the present case, the Court finds that in December 2008, the government returned three boxes of items that were not relevant to the case. With regard to irrelevant items

seized, the government represented generally at the October 29 hearing that sometimes agents

seized irrelevant items in their hurry to complete the search in order to limit the inconvenience to

the homeowner.  The Sixth Circuit has recognized that "[w]here circumstances, . . ., make it

impracticable to inventory and record at the site of the search the numerous contents of the

suitcase which contained incriminating evidence, the seizure of irrelevant items within the

suitcase along with the relevant items does not violate the fourth amendment, provided the

irrelevant items are returned to [the defendant]."  United States v. Blakeney, 942 F.2d 1001,

1028 n.13 (6th Cir.), cert. denied, Kutnyak v. U.S., 502 U.S. 1008 (1991).  Although the Court

appreciates the practical considerations associated with searching for financial documents amid

thousands of papers and folders contained in a home, the Court finds that the agents executing

the search in this case did not exercise the precision that the Court expects in seizing documents

from a private residence.  The seizure of numerous irrelevant items such as recipes, instruction

manuals to appliances, medical and dental records, and catalogs for Christian books, to name but

a few examples, illustrates the lack of care exhibited during the search.  Nevertheless, these

items were returned, and despite the regretful course of events that occurred with regard to these

items, the Court cannot find that their seizure converted the searches into general searches based

upon the binding case law.  See Garcia, 496 F.3d at 507.

       The government returned another 197 items at the January 22 suppression

hearing, contending these items were properly seized but were not needed for trial.  The Court

appreciates the government's efforts, though belated, in narrowing the scope of the controversy.

The Court conducted no hearing and has made no findings as to the propriety of the seizure of

these items.  Accordingly, the Court does not count these items among those improperly seized

under the search warrants.

Finally, the Court has found that six items were improperly seized under the search warrants and did not fall within the plain view doctrine. The defendants rely upon <u>United States v. Medlin</u>, which holds that "[w]hen law enforcement officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant." 842 F.2d 1194, 1199 (10th Cir. 1988) (holding seizure of 667 items outside the scope of the search warrant rendered the search warrant a general warrant). The Court finds that the improper seizure of six items does not equate to the gross violation that occurred in <u>Medlin</u>. <u>See</u> <u>United States v. Carpenter</u>, 317 F.3d 618, 624 (6th Cir. 2003) (holding that the improper seizure of a few items was not they type of flagrant violation exhibited in <u>Medlin</u> and did not require suppression of all the properly seized evidence), <u>rehearing en banc</u>, 360 F.3d 591 (6th Cir. 2004) (reconsidering <u>Leon</u> good faith issue). Accordingly, although the Court finds that these six items were improperly seized and should be suppressed, it does not find that their improper seizure necessitates the suppression of all the properly-seized evidence from both searches.

*(iv) Search of Barn, Garage, and Vehicles*

In her supplemental reply brief [Doc. 110] discussing the applicability of the good faith exception of <u>United States v. Leon</u>, 468 U.S. 897 (1984), Mrs. Dirr raises the issue that Agent Groves exceeded the scope of the Tennessee search warrant by searching and photographing places (her barn, garage, and vehicles) that he was not permitted to search by the

83

search warrant, which only permits the search of her residence. Mrs. Dirr contends that the barn, garage, and vehicles were only included in the unincorporated affidavit rather than in the search warrant itself. Mr. Dirr joined [Doc. 111] in the "position" taken by Mrs. Dirr in her reply brief. Because of the way in which this issue was raised, the government has not had opportunity to respond to it as the government's supplemental reply was filed on the same day as Mrs. Dirr's.

The Fourth Amendment requires that search warrants describe the place to be searched with particularity. A warrant satisfies this requirement "if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended." Steele v. U.S., 267 U.S. 498, 503 (1925).

The Tennessee search warrant states that the items for which the agent is searching are "on the premises known as the residence of Brett and Renee Dirr, 4199 Burnett Road, Walland, Tennessee 37886, a map and a photograph of said premises is attached hereto as Attachment A and incorporated by reference herein[.]" The search warrant references (but does not expressly incorporate or attach) the supporting affidavit, which states that evidence of the defendants' tax evasion "is being maintained and will be found at 4199 Burnett Road, Walland, Tennessee 37886 and in the outbuildings and appurtenances associated with such residence, in the curtilage surrounding such residence and in the vehicles located on the curtilage surrounding such residence as more fully depicted in Attachment A." Attachment A shows a photograph of the defendants' house and describes the property as "located in an extremely rural area" and as "the last house at the end of Burnett Road, a dead end. The house is a one story wood home with a blue garage door." The map on Attachment A depicts a graphical representation of the defendants' house in relation to the surrounding streets. No other buildings or vehicles are

84

depicted on the map.

Initially, the Court finds that the defendants' attached garage is specifically referenced in Attachment A, which is incorporated by reference in the search warrant. Thus, the defendants' contention that a search of the garage was beyond the scope of the location stated in the search warrant is simply incorrect.

Moreover and more importantly, the Court finds that it has no evidence before it that the agents searched the defendants' barn, garage, or vehicles. A photo log was submitted by the government along with the Tennessee search warrant attached to the government's supplemental brief [Doc. 98]. This photo log shows that a photograph of a Dodge Van motorcoach and a photograph of a Ford Ranger truck were taken during the search, with the "ROOM" associated with these photographs being listed as "BARN[.]" The Court has no evidence that the agents entered the barn to take these photographs or that the vehicles depicted in the photographs were entered and searched. No evidence was seized from the barn, garage, or the defendants' vehicles. Agent Groves testimony at the January 22 suppression hearing related to the search of and items seized from the defendants' house. Accordingly, the Court cannot find that the agents exceeded the scope of the Tennessee search warrant in the locations searched.

Even if the Court interpreted the photo log to be evidence that the agents had searched the defendants' barn, the Sixth Circuit has approved the search of an outbuilding within the curtilage of a defendants' property, even though the search warrant did not list the outbuilding. Fine v. U.S., 207 F.2d 324, 325 (6th Cir. 1953), cert. denied, 346 U.S. 923 (1954). In Fine, the search warrant authorized the search of the "'premises known as [the defendant's] residence'" and described the defendant's house. Officers searched a shed located twenty feet

85

from the residence and found five half-gallon jars of whiskey.  Id.  The court found that the search of the shed was not improper because the terms "premises" and "residence" used in the search warrant are "broader than a mere description of the house and certainly include the curtilage."  Id.; see also United States v. Watkins, 179 F.3d 489, 495 (6th Cir. 1999) (Boggs, J., concurring) (observing that Sixth Circuit case law "clearly holds that a warrant for the search of a specified residence or premises authorizes the search of auxiliary and outbuildings within the curtilage"); United States v. Bennett, 170 F.3d 632, 639 (6th Cir. 1999) (holding that the supporting affidavit did not need to establish separate probable cause to search a shop building located one hundred feet from the defendant's residence because the warrant established probable cause to search the residence).  In the present case, Agent Groves' sworn affidavit states that the defendants' barn and vehicles are within the curtilage of their property.  Under the reasoning in Fine, the Court finds that a search of the defendants' barn and/or vehicles would have been within the scope of the Tennessee search warrant.


**2.  Other problems with the Execution of the Tennessee Search Warrant**

The defendants content that the Tennessee search warrant was improperly executed because (1) the executing officers did not present Mrs. Dirr with a copy of the search warrant at the inception of the search, (2) the executing officers did not give Mrs. Dirr a copy of the supporting affidavit at the time of the search, (3) non-federal law enforcement officers were present during the search, and (4) the executing officer improperly prepared the inventory at the conclusion of the search.  The government responds that the executing officers followed proper procedures with respect to the execution of the search warrants.

86

*(i) Not presented immediately.*

The defendants fault the executing officers for failing to present the search

warrant to Mrs. Dirr immediately upon their arrival at the defendants' home to execute the

search warrant. Citing to a Ninth Circuit case, they argue that Rule 41(d) of the Federal Rules of

Criminal Procedure requires that the search warrant be presented at the inception of the search.

See United States v. Gantt, 194 F.3d 987, 1001 (9th Cir. 1999), overruled by United States v.

Grace, 526 F.3d 499, 506 (9th Cir. 2008) (discussing the certification process for interlocutory

appeals). They assert that in the present case, the agents did not give the search warrant to Mrs.

Dirr until after they had been searching for one hour. The government responds that the

defendants failed to elicit any testimony at the suppression hearing about the sequence of events

at the time of the search. It contends that the officers first secured the premises for officer safety

before they presented a copy of the search warrant to Mrs. Dirr, who was belligerent at the

inception of the search.

Rule 41(f)(1)(C) of the Federal Rules of Criminal Procedure provides that the

executing officer "must give a copy of the warrant and a receipt for the property taken to the

person from whom, or from whose premises, the property was taken or leave a copy of the

warrant and receipt at the place where the officer took the property." Neither the Fourth

Amendment nor Rule 41 requires that the executing officer present a copy of the search warrant

to the property owner before conducting the search. United States v. Grubbs, 547 U.S. 90, 99

(2006). "The Constitution protects property owners not by giving them license to engage the

police in a debate over the basis for the warrant, but by interposing, *ex ante*, the 'deliberate,

impartial judgment of a judicial officer . . . between the citizen and the police,' and by providing,

*ex post*, a right to suppress evidence improperly obtained and a cause of action for damages." Id. (internal citation omitted) (quoting Wong Sun v. U.S., 371 U.S. 471, 481-82 (1963)). The defendants' contention about the timing of the presentation of the search warrant, even if taken as true, avails them no relief.

### (ii) Affidavit not accompanying warrant.

The defendants argue that the officers' failure to give Mrs. Dirr a copy of the affidavit supporting the search warrant was a violation of Rule 41(d) of the Federal Rules of Criminal Procedure. Nothing in Rule 41(d) requires the executing officer to give a copy of the affidavit supporting the search warrant to the property owner. In fact, Rule 41(d)(2)(B) provides that an issuing judge "may wholly or partially dispense with a written affidavit and base a warrant on sworn testimony if doing so is reasonable under the circumstances." Accordingly, this contention is also without merit.

### (iii) Presence of non-federal officers.

The defendants fault the execution of the Tennessee search warrant because other non-federal officers were present along with the federal agents. At the October 29, 2008 hearing, counsel for Mr. Dirr argued that the search warrant did not "cover" these non-federal officers. The government states that the uniformed non-federal officers were present to maintain order during the search. Again no testimony was elicited at the January 22 suppression hearing with regard to this issue.

Other law enforcement officers, not listed as executing officers, may be present

during the execution of a search warrant to aid the executing officer or officers. 18 U.S.C. §

3105. "[I]t is generally left to the discretion of the executing officers to determine the details of

how best to proceed with the performance of a search authorized by warrant[.]" Dalia v. U.S.,

441 U.S. 238, 257 (1979). The Court finds that the presence of local law enforcement officers

during the execution of the Tennessee search warrant to aid the IRS agents executing the search

was permissible. United States v. Lee, 581 F.2d 1173, 1178 (6th Cir.) (holding that presence of

state officer to assist federal agent in executing search warrant did not require suppression of

evidence seized), cert. denied 439 U.S. 1048 (1978).


*(iv) Improper preparation of inventory.*

The defendants also fault the execution of the Tennessee search warrant because

they contend that Agent Groves failed to prepare a thorough inventory of everything taken in the

search. "[F]ailure to follow the requirements of Rule 41 of the Federal Rules of Criminal

Procedure pertaining to inventory of objects seized and a prompt return to the court has been

held not to require invalidation of an otherwise properly issued and executed search warrant or

the suppression of evidence acquired under it." United States v. Dudek, 530 F.2d 684, 688 (6th

Cir. 1976). This issue is also devoid of merit.


**C. Miranda Violation**

The defendants allege [Doc. 55] that on August 11, 2005, Agent Brian Groves

and another agent went to Mr. Dirr's hotel room in South Carolina and "coerced entry by

threatening to harass him the next day at his work[,]" if he did not allow them to enter. The

89

defendants contend that the agents proceeded to interrogate Mr. Dirr for two hours without ever advising him of his Miranda rights. They maintain that because the government cannot show that the defendant was provided the Miranda warnings and waived his rights, it cannot use any evidence obtained as a result of the "interrogation" at trial. The government responds [Doc. 65] that the agents engaged in a consensual meeting with Mr. Dirr in his hotel room on August 11, 2005. It contends that the defendant was not in custody, the conversation was not an interrogation, and, thus, no Miranda warnings were necessary. As evidence of the consensual nature of the meeting, the government attached Mr. Dirr's notes from the meeting as an exhibit to its response. These notes characterize the agents as polite. The government also notes that the defendant requested that the agents meet him at a nearby restaurant the next morning. In reply [Doc. 74], the defendants contend that the agents also induced Mr. Dirr to allow them into his hotel room with "false promises" in that they told him that he would be better off if he cooperated with the government.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is *in custody* until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948.

Whether the Miranda warnings are necessary at a given point in time turns upon whether the individual is in custody and whether he or she is being interrogated: "'[C]ustodial

90

interrogation'" is defined "as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Thompson v. Keohane, 516 U.S. 99, 107 (1995) (quoting Miranda, 384 U.S. at 444); United States v. Jones, No. 03-5123, 2005 WL 900870, at *3 (6th Cir. 2005); United States v. Macklin, 900 F.2d 948, 950 (6th Cir.) ("A person is entitled to receive Miranda warnings only if questioned while in custody."), cert. denied, 498 U.S. 840 (1990). The question of whether an individual has been subject to custodial interrogation involves evaluating the surrounding circumstances and determining if a reasonable person in those circumstances would have believed he or she could not end the questioning. Keohane, 516 U.S. at 112; Jones, No. 03-5123, at *3. Moreover, the question of whether an individual is subject to interrogation involves a finding "a measure of compulsion above and beyond that inherent in custody itself." Rhode Island v. Innis, 446 U.S. 291, 300 (1980); Jones, No. 03-5123, at *4.

Turning to the case at hand, neither party questioned Agent Groves about the August 11, 2005, encounter at Mr. Dirr's hotel room. Thus, the Court is left with scant evidence about what transpired at the meeting–a reference to the meeting in the sworn affidavit supporting the South Carolina search warrant and Mr. Dirr's notes from the meeting, which the government provided as an exhibit to its response to the suppression motion. The affidavit to the South Carolina search warrant relates that Agent Groves met with Mr. Dirr in his hotel room on August 11, 2005. Before Mr. Dirr allowed Groves to enter, Mr. Dirr asked him to fill out a questionnaire. The affidavit states that Mr. Dirr agreed to speak with him inside the hotel room. "During our conversation, Dirr routinely questioned my authority and jurisdiction as a Federal agent. At the conclusion of our meeting, Dirr agreed to meet with me the following morning if

91

he chose to cooperate or admit he had violated the internal revenue laws." Groves states that Mr. Dirr met with him and another agent the following morning at a local restaurant, at which meeting, Mr. Dirr again questioned his authority and jurisdiction as a Federal agent.

The government attached Mr. Dirr's notes from the August 11, 2005 encounter with the agents to its response. Mr. Dirr's notes relate that around 7:25 p.m., agents knocked on the door of his hotel room. He states that they did not initially identify themselves as IRS agents but that after the third knock, they told him they were IRS agents and said, "[Y]ou can talk to us tonight or we will be at your workplace tomorrow morning–UEC Electronics, 5918 Howard Street, in Hanahan and make things uncomfortable for you. In fact[,] we just came from there." According to the notes, Mr. Dirr printed a copy of a questionnaire, opened the door a crack, and gave the questionnaire to the agents. He told the agents that he would be "happy to speak to them[,]" if they answered his questionnaire. The agents declined to answer the questionnaire and told Mr. Dirr that they would not speak with him through a partially opened door. The agents told Mr. Dirr that they did not come to arrest him and that they did not have a search warrant but that they just "wanted to talk." Mr. Dirr then recounted that he "opened the door and they politely asked if they could come in–I said yes." Mr. Dirr permitted the agents to sit down in his hotel room, and they spoke about the IRS investigation. Mr. Dirr noted that the agents told him they were there "to try and make things easier on me." Agent Groves told the defendant they were interested in "get[ting] guys like Bill Benson" and asked if Mr. Dirr would be willing to record conversations with Benson. At one point in the conversation, Mr. Dirr notes that Agent Cox asked him, "Now, you don't want your wife to go to jail do you?"

Based upon a review of the affidavit and Mr. Dirr's notes, the Court finds that Mr.

Dirr was not in custody when he spoke with Agents Groves and Cox in his hotel room. Both the

affidavit and the notes reveal that Mr. Dirr invited the officers into his hotel room, knowing that

they were federal agents. The agents informed Mr. Dirr that they were investigating him for tax

evasion. Moreover, they did not attempt to arrest the defendant at any time during the meeting.

The Sixth Circuit has found that a defendant was not in custody for purposes of Miranda when

he invited the officers into his dormitory room, the officers identified themselves and told the

defendant what they wanted to discuss, and the officers did not arrest the defendant or restrict his

movement in any way. Jones, No. 03-5123, at *3 (also noting that the officers immediately gave

the defendant the Miranda warnings after he made incriminating statements); see also United

States v. Warner, 971 F.2d 1189, 1202 (6th Cir. 1992) (holding that defendant, who was

questioned by officers at her parents' residence and informed of an existing grand jury

investigation, was not entitled to the Miranda warnings because she was not in custodial setting

and was not under arrest or restraint); United States v. Greene, 546 F. Supp. 28, 30 (E.D. Tenn.

1982) (holding that defendant interviewed at place of employment and again in her home was

not in custody on either occasion). Similarly, the Court finds that Mr. Dirr was not in custody

during the August 11, 2005 meeting with the agents.

   The Court also finds that although Mr. Dirr was questioned by the agents, they

did not coerce him into divulging information. Mr. Dirr questioned the agents' authority

throughout the meeting and, ultimately, agreed to meet with the agents again the following

morning. Moreover, Mr. Dirr ultimately declined to cooperate with the agents on both

occasions. Accordingly, the Court finds that Mr. Dirr was not subject to custodial interrogation

on August 11, 2005, such that he was entitled to the Miranda warnings. The statements made by

93

Mr. Dirr at the August 11, 2005 meeting in his hotel room are not subject to suppression.

## D. Rule 41(g) Return of Property

The defendants contend that all of the items seized in the two searches must be returned to them so that they can prepare for trial. The government maintains that its retention of the items seized from the defendants' home and Mr. Dirr's hotel room will not impede the defendants' trial preparation because the government has continued to allow the defendants to view the items, as permitted in Rule 16 of the Federal Rules of Criminal Procedure, at the United States Attorney's Office. The government has also offered to have all of the non-copyrighted items copied for the defendants at the defendants' expense. The defendants summarily insist on the return of the original items, arguing that the government can retain copies.

Although not specifically stated as such, the Court takes this issue to be a request for the return of property pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure. Rule 41(g) provides:

> A person aggrieved by an unlawful search and seizure of property *or by the deprivation of property* may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

(Emphasis added). In the present case, the Court has found most of the items still retained by the government were properly seized, either pursuant to the search warrants or the plain view doctrine. The plain language of the rule reveals that parties may seek the return of property even

94

when it has been lawfully seized.  The Advisory Committee Notes to the rule[49] provide guidance

as to when such pretrial return of property lawfully in the government's possession would be

appropriate:

> No standard is set forth in the rule to govern the
> determination of whether property should be returned to a person
> aggrieved either by an unlawful seizure or by deprivation of the
> property.  The fourth amendment protects people from
> unreasonable seizures as well as unreasonable searches, United
> States v. Place, 462 U.S. 696, 701 (1983), and reasonableness
> under all of the circumstances must be the test when a person seeks
> to obtain the return of property.  If the United States has a need for
> the property in an investigation or prosecution, its retention of the
> property generally is reasonable.  But, if the United States'
> legitimate interests can be satisfied even if the property is returned,
> continued retention of the property would become unreasonable.

Fed. R. Crim. P. 41(g), advisory committee notes to 1989 amendments.

In the present case, the government has a legitimate interest in retention of the

defendants' property, the prosecution of the pending charges.  Accordingly, the Court finds that

the government's retention of the defendant's property is reasonable.  Moreover, the Court notes

that the government has returned three boxes of items that were not relevant to the case and 197

items that it deemed to be lawfully seized but does not plan to use at trial.  The defendants make

no argument that the absence of the retained property is affecting them in ways other than

making it less convenient for them to defend this case.  Although the defendants make passing

references in some of their filings to the seizure of unpaid bills and blank checks, the Court notes

that the seizure of these items occurred in August 2005 and that the defendants did not move for

their return until August 2008, despite being indicted in April 2008.  The Court concludes from

---

[49]The rule was formerly found at 41(e).

this chronology of events that the defendants' need for the property stems only from their defense of this case. The Court sees no disadvantage to the defendants in receiving only copies of the seized materials prior to trial,[50] while the government retains the originals to maintain their integrity for use at trial. With regard to the copyrighted items, the Court finds the government's reasonable need for these articles outweighs the inconvenience to the defendants of having to view them at the United States Attorney's Office. Moreover, the presence of an agent to secure the integrity of the evidence during the defendants' visits is a reasonable precaution. Accordingly, the defendants' motion for the pretrial return of their property should be denied.

---

[50]The Court makes no finding on the ultimate disposition of the items after the conclusion of the case.

## II.  CONCLUSION

For the reasons set forth herein, the Court **RECOMMENDS** that Defendants' Joint Motion to Suppress and Motion to Compel the Return of Defendants' Documents [**Doc. 55**] be granted in part in that (1) a September 16, 2003 printout of an internet article entitled "IRS and States Announce Partnership to Target Abusive Tax Avoidance Transactions," (2) excerpts from the "Master File Decoder" by Christopher M. Hansen, (3) a folder labeled "Cong. John Duncan," (4) a folder labeled "Wallace Institute, " (5) two volumes of the Organic Sovereign American Freeman Compendium, and (6) an unlabeled folder containing business cards and correspondence with David Miner should be suppressed. The defendants' Joint Motion to Suppress should be denied in all other respects.[51]

ENTER:

                    s/  C.  Clifford  Shirley,  Jr.
                    United States Magistrate Judge

---

[51]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).

97